**AMECKS, INC., doing business as Amecks Gravel Company, Appellant,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, Respondent.**

No. WD 52362.

Missouri Court of Appeals, Western District.

Nov. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 24, 1996.

Application to Transfer Denied Feb. 25, 1997.

Dennis J. C. Owens, Kansas City, John Pletz, Jefferson City, for appellant.

Thomas Graham, Jefferson City, for respondent.

SPINDEN, Presiding Judge.

Amecks, Inc., doing business as Amecks Gravel Company, sued Southwestern Bell Telephone Company for breaching an agreement to purchase gravel from Amecks. Amecks' petition sought relief based upon promissory estoppel and breach of duty of good faith and fair dealing. The circuit court granted Southwestern Bell's motion for summary judgment, and Amecks appeals. We affirm.

On April 1, 1985, Southwestern Bell and Amecks agreed that Southwestern Bell could purchase washed river gravel from Amecks from April 1, 1985, to April 1, 1987. On April 1, 1987, Southwestern Bell and Amecks agreed to continue the arrangement until March 31, 1989, but, after giving Amecks 30 days written notice, Southwestern Bell terminated the contract[1] on December 7, 1988.

Their written agreement said:

It is expressly understood and agreed that this Agreement does not grant [Amecks] an exclusive privilege to sell to [Southwestern Bell] any or all products of the type described in the "Material Clause" which [Southwestern Bell] may require, nor requires the purchase of any products from [Amecks] by [Southwestern Bell]. It is, therefore, understood that [Southwestern Bell] may contract with other manufacturers and suppliers for the procurement of comparable products. In addition, [Southwestern Bell] shall determine the extent to which [Southwestern Bell] will market, advertise, promote, support, or otherwise assist in further offering of the MATERIAL.

The agreement also had a termination clause which provided:

[Southwestern Bell] may terminate this Agreement in whole or in part by giving [Amecks] at least 30 days prior written notice. Prices for any work remaining with [Amecks] under this Agreement terminated in part may be adjusted to fairly reflect [Amecks'] costs resulting from work withdrawn. Upon termination, [Southwestern Bell] shall pay [Amecks] all amounts due for services and material provided by [Amecks] to [Southwestern Bell] under this Agreement up to and including the effective date of termination. Such payment shall constitute a full and complete discharge of [Southwestern Bell's] obligations under this Agreement.

The agreement further said:

This Agreement shall incorporate the typed and written provisions on [Southwestern Bell's] orders issued pursuant to this Agreement and this Agreement as supplemented by such provisions shall constitute the entire Agreement between the parties and shall not be modified or amended, except by a writing signed by both parties. Printed provisions on the reverse side of [Southwestern Bell's] orders and all provisions on [Amecks'] forms shall be deemed deleted. Estimates furnished by [Southwestern Bell] shall not constitute commitments. The provisions of this Agreement shall supersede all prior oral and written quotations, communications, Agreements and understandings of the parties in respect of the subject matter of this Agreement.

When Southwestern Bell terminated the agreement, Amecks sued Southwestern Bell for breach of duty of good faith and fair dealing, prima facie tort, breach of contract and promissory estoppel. Amecks averred that during contract negotiations Southwestern Bell representatives assured Amecks that it could reasonably expect orders of 110,550 bags of gravel a year for the states of Kansas and part of Missouri. Southwestern Bell told it that Southwestern Bell would expand Amecks' service to include Arkansas, Oklahoma, Texas and all of Missouri. Amecks contended that Southwestern Bell purchased an average of only 65,700 bags a year and that Southwestern Bell never asked

---

**1.** Although the parties freely refer to the their agreement as a contract, we are inclined to believe that the parties are according it far too much dignity. Southwestern Bell merely agreed in the document to pay for all of the gravel it ordered from Amecks without any obligation to order any. We have difficulty understanding why such an agreement necessitated the formalities resorted to by the parties. The provisions quoted infra illustrate the point.

Amecks to serve the additional territory. The circuit court granted Southwestern Bell's motion for summary judgment on all four counts. Amecks appeals.

Amecks acknowledges that Southwestern Bell paid it for all services and materials. Amecks asserts, however, that the circuit court erred in granting summary judgment on its claims for promissory estoppel and breach of good faith and fair dealing because genuine issues of material fact precluded the granting of summary judgment on these claims.

Concerning its promissory estoppel claim, Amecks contends that these material facts were still at issue: (1) whether Southwestern Bell's promises during contract negotiations were sufficiently definite to support a claim of promissory estoppel, (2) whether Amecks relied on those promises, and (3) whether Amecks' reliance was detrimental to its business. We do not agree.

Amecks relies on the deposition testimony of Harold Rosen, Amecks' president, to support its contention that Southwestern Bell made a promise. Rosen testified regarding talks with Southwestern Bell prior to the parties' signing of the initial agreement:

Q. All right. I'd like to hand you what's been marked as Plaintiff's Exhibit No. 4. Can you tell me what this is?

A. This is an estimate from Southwestern Bell of the approximate number of bags that they thought they could put a handle on that they would use annually in the three-state area and my pricing, which is in my handwriting, plus an additional charge of 30 cents per bag. However, it was modified by Mr. King.

. . . .

Q. And what was said with regard to the quantity of bags at this meeting?

A. Well, at this meeting he could not put a definite handle on it, because there was no exact number of bags known, either directly or indirectly, through central purchasing. So the best he could do was put a guesstimate on it from his end of it as stated.

Q. Did he make any indication to you what he believed about this 110,297 bags?

A. Yes. The representation was, this is the best handle that they could come up with but it was probably half as much as they really thought was for the three states and we accepted it at face value.

. . . .

Q. Okay. Was anything said at the meeting with regard to additional areas of the company?

A. Yes. He said that he wanted us to—for him to proceed with the other areas. He wanted us to prove ourselves, particularly the first year, and that there were no complaints and the product was right and the service was up to snuff and that we would then expand into Missouri and Arkansas and then go in—he would make recommendations to Mr. Scovill for us to go into Oklahoma and Texas as well.

■ This does not establish that Southwestern Bell made any promises, but, even if it did, the written agreement said that it "constitute[d] the entire Agreement between the parties[.]" Rosen framed Southwestern Bell's so-called promise in terms of "estimate" and "guesstimate." Such alleged promises are too indefinite to support a claim of detrimental reliance.

■ Promissory estoppel requires a promise. *Clark v. Washington University*, 906 S.W.2d 789, 792 (Mo.App.1995). The promise must be definite.

Moreover, given the terms of the agreement, Amecks was fully aware that Southwestern Bell could terminate the arrangement at any time and that Southwestern Bell was not obligated to purchase any gravel from Amecks. Their agreement provided that the written contract superseded prior oral agreements and that "[e]stimates furnished by [Southwestern Bell did] not constitute commitments." The language of the agreement and the parties' negotiations contradict Amecks' claim of promissory estoppel. Amecks also contends that the circuit court erred in granting summary judgment on its claim of breach of duty of good faith and fair dealing. Amecks asserts that these material facts were still at issue: whether Southwestern Bell acted in bad faith in its business dealings with Amecks, and whether Amecks'

business was harmed by those acts of bad faith. Amecks argues that Southwestern Bell's compliance with the 30 days notice before terminating the contract does not mean that it satisfied the duty of good faith and fair dealing.

" 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.' " *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133, 157 (Mo.App.1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)). "That duty prevents one party to the contract from exercising a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *Id.*

Amecks contends that it presented the circuit court with substantial evidence of Southwestern Bell's bad faith and of the harm suffered by Amecks because of it. It points to Rosen's testimony that the loss of Southwestern Bell's business damaged Amecks' business reputation with other companies and that it lost profits from other business deals because of Southwestern Bell. Amecks fails to explain, however, how this evidence establishes bad faith given Southwestern Bell's rights under the agreement. Southwestern Bell's termination of the contract did not deny Amecks' expected benefit because, according to the agreement's terms, Southwestern Bell was not required to purchase *any* gravel from Amecks. Southwestern Bell was obligated to give Amecks 30 days notice before terminating the contract, and it did that.

We affirm the judgment of the circuit court.

SMART and EDWIN H. SMITH, JJ., concur.