**KEARNEY COMMERCIAL BANK, Respondent,**

v.

**Donald Leslie POPEJOY, Jr., et al., Lana L. Popejoy, Appellants,**

**Marty Lane Popejoy and PK & M Associates, Inc., Kimberly K. Popejoy, Respondents.**

**No. WD 61757.**

Missouri Court of Appeals,
Western District.

Sept. 9, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 28, 2003.

Application for Transfer Denied
Nov. 25, 2003.

Robert H. Dunsford, Kansas City, MO, Attorney for Donald and Lana Popejoy.

John R. Cleary, Kansas City, MO, Attorney for Kearney Commercial Bank.

Harley K. Desselle, Independence, MO, Attorney for Marty and Kimberly Popejoy and PK & M Associates.

Before LOWENSTEIN, P.J., SMART and EDWIN H. SMITH, JJ.

HAROLD L. LOWENSTEIN, Judge.

The issue in this appeal is one of first impression: Does the remedy of promissory estoppel, Section 90 of the Restatement (Second) of Contracts (1981), come to the aid of a lender in its suit to quiet title of realty proffered as collateral for a loan where the lender asserts a post-loan reliance on the oral, and later discovered unfilled promise made by one of the joint tenants of the property to convey his undivided interest to the other joint tenant (his brother) who vouches to the lender that he and his assignee as being the sole holder of fee simple title?

Donald Popejoy, Jr., and his wife, Lana ("Appellants") appeal the judgment in this court-tried case in favor of respondent Kearney Commercial Bank (Bank) on the bank's petition to quiet title to real estate

on which it had a security interest. The court found that the borrower, PK & M Associates, owned a certain parcel of real estate in fee simple and that Bank had a valid and enforceable first deed of trust on the property. Appellants argue the trial court erred in applying the equitable remedy of promissory estoppel.

## STATEMENT OF FACTS

The facts concerning this action, viewed in the light most favorable to the judgment, *Moore v. Weeks,* 85 S.W.3d 709, 716 (Mo.App.2002), date back to 1990. In March 1990, Donald Popejoy, Jr. and his brother Marty Popejoy, a respondent, acquired approximately 160 acres of undeveloped real estate located in Clay County, (the "Property"). Title was taken by the brothers, Marty (married to respondent Kimberly) and Donald (then single), as joint tenants. Their intent was that the brothers, along with their father, Donald Popejoy, Sr. ("Father") and Melvin Launius, a business associate, would develop the land as residential property.

Following the acquisition of the Property, Donald Jr. married in 1993 and later ceased operations of a company that he and his wife, Lana, owned. At the time that the company was closed, $86,000 was owed to the Internal Revenue Service for payroll taxes that had been withheld from employees but not paid to the IRS. The male Popejoys and Launius became concerned that the IRS might seize Donald's undivided one-half interest in the Property, thus inhibiting the ability to develop the Property. They determined that Donald should convey his interest in the Property to Marty.

In January 1996, the Popejoys and Launius meet with an attorney to discuss the transfer of the property to Marty. As a result, a "Confidential Title Holding Trust Agreement" (the "Agreement") was signed by Marty, Donald, and Lana. The Agreement stated that Donald and Lana "will transfer title of record to the real property ... to Marty .. to be held, however, in trust for benefit of [Donald and Lana], subject to any encumbrances of record." It was also discussed that once the property was transferred to Marty, that Marty would then transfer the property to a corporation to be formed to develop the Property.

In addition to signing the Agreement, Donald also signed a quit claim deed, but his signature was not notarized. He took the deed home to obtain Lana's signature and said he would then record it. Lana did not sign the deed and it was never recorded.

A few months after the meeting at which the Agreement was signed, Marty, assuming that the deed had been recorded, conveyed the property by warranty deed to the newly created PK & M Associates, Inc., based upon his belief that Donald had conveyed the property to him as contemplated in the Agreement. As part of the warranty deed to PK & M, Marty represented that he and his wife, Kimberly, were "lawfully seized of an indefeasible estate in fee" and had the right to convey the Property. PK & M was the alter ego of Marty. The corporation's only asset was the property.

Several years later, in October 1998, PK & M entered into a loan transaction with Bank in which PK & M purchased four promissory notes[1] from the Bank for $308,223.71. As part of this transaction, PK & M executed a promissory note to the respondent Bank in the amount of the purchase price of the notes, secured by a

---

1. Three of the promissory notes purchased in this transaction were executed by a company owned by Donald, Marty, and Donald, Sr. The fourth was executed by Marty and his wife.

deed of trust; and Marty also executed an affidavit on behalf of PK & M in which he stated that PK & M was the sole owner of the property. At this time, the Bank had no knowledge of the Agreement in which Donald agreed to transfer the property to Marty. (The Agreement never surfaced until July 03, 1999.)

As part of its customary banking practices, the Bank engaged Thomson Title Corporation ("Thomson Title") to do a title search to confirm whether title was held by PK & M. After finding the 1996 warranty deed transferring the Property from Marty to PK & M, Thomson Title determined that fee simple ownership in the Property was vested in PK & M. Thomson Title failed to recognize, however, that Donald had an interest in the Property that was never transferred to Marty.[2]

In July 1999, after learning that the Property was advertised for sale, Donald filed the Agreement. Four months later, Marty informed Bank that, because Donald had filed a claim against the Property, PK & M would make no future payments on the loan.

In March 2000, Bank filed a petition against Donald, Lana, Marty, and PK & M to quiet title to the property.[3] Although not explicitly involving the theory of promissory estoppel, the action to quiet title invoked the elements of that theory. Following a bench trial, the court determined that PK & M owned the Property in fee simple and that the Bank's deed of trust was valid and enforceable. In doing so, the court found that the promise made by Donald was "binding and enforceable under the Restatement (Second) of Contracts, § 90 (1981)." A more detailed timeline of the events contained in this case appears as an Appendix to this opinion.

## STANDARD OF REVIEW

This court's review of a case tried without a jury is governed by the principles of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). This court will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32. The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the judgment, disregarding all contrary evidence and inferences. *Moore*, 85 S.W.3d at 716.

## ANALYSIS

On appeal, Appellants Donald and Lana assert error in the trial court's reliance on the theory of promissory estoppel in finding in favor of the respondent Bank. The Bank's suit to quiet title included PK & M, Marty and Kimberly Popejoy.

Courts are to apply the doctrine of promissory estoppel "with caution, sparingly and only in extreme cases to avoid unjust results." *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 165

---

2. In this title report, Thomson Title relied on a previous report, issued in conjunction with one of the earlier promissory notes executed with respect to the Property, that had failed to discover the nonexistence of a deed transferring title from Donald to Marty. This error was compounded in the title report based upon the October 1998 transaction, since the examiner did not go back beyond the previous report to search the chain of title.

3. The petition also included an alternative claim of breach of warranty against Marty and PK & M. This claim was dismissed without prejudice by the Bank. There is no lack of finality under Rule 74.01(b) as the trial court expressly found there was "no just reason for delay."

(Mo.App.2000). Under the First Restatement, in order to prevail on a claim of promissory estoppel, a party had to establish four elements: "(1) a promise; (2) promisee detrimentally relies on the promise; (3) promisor could reasonably foresee the precise action the promisee took in reliance; and (4) injustice can only be avoided by enforcement of the promise." *Halls Ferry Invs., Inc. v. Smith,* 985 S.W.2d 848, 853 (Mo.App.1998), *Chesus v. Watts,* 967 S.W.2d 97, 107 (Mo.App.1998). Now, under the Restatement (Second) of Contracts § 90 (1981), relied upon by this court in *Chesus v. Watts,* the equitable remedy of promissory estoppel was extended to provide relief to parties other than the original promisee, as long as the four elements are met. *Id.* at 106. Section 90 states:

> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or *a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981) (emphasis added). Further, comment c of § 90 states that "[i]f a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases rests on the same basis and depends on the same factors as in cases of reliance by the promisee." Thus, the Bank may assert the theory of promissory estoppel to enforce the promise of appellant, Donald, if it can establish all elements. *Farmland Indus., Inc., v. Bittner,* 920 S.W.2d 581, 583 (Mo. App.1996).

### A. THE PROMISE

■ "A promise is a 'manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Prenger v. Baumhoer,* 939 S.W.2d 23, 26 (Mo.App.1997) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2 (1981)). Put another way, a promise is an expression of intention by the promisor to "bring about a specified result in the future." *Moore v. Mo.-Neb. Express, Inc.,* 892 S.W.2d 696, 703 (Mo. App.1994). To satisfy this first element, the promise must be definite and must be made "in a contractual sense." *Id.* (internal quotations and citations omitted).

Here, the Agreement executed by Donald contained a promise to Marty. In the Agreement, Donald and Lana agreed to transfer their interest in the title to Marty. The Agreement states that "Owners [Donald and Lana] will transfer title of record to the real property ... to [Marty] ... to be held ... in trust for benefit of Owners." This promise may be sufficiently definite to satisfy the first element of promissory estoppel. While Donald argues in his brief that it was the parties' understanding that the transfer would occur in the future only if the IRS appeared to be interested in placing a lien on the real estate, this is not reflected in the Agreement. Assuming for the sake of argument the promise element has been satisfied, it is necessary to go to reliance.

### B. Reliance

■ The party asserting promissory estoppel must show that the promisee detrimentally relied on the promise and that the reliance was reasonable. *Blackburn v. Habitat Dev. Co.,* 57 S.W.3d 378, 387 (Mo. App.2001). With respect to this element, the court found the following:

Kearney Commercial Bank would not have entered into the October 9, 1998 loan transaction without the representations made to it by PK & M Associates, Inc. and Marty Popejoy as to PK & M Associates, Inc.'s ownership of the [Property] and its right to grant the Bank a deed of trust security interest in the property. Kearney Commercial *Bank relied* on *Donald Popejoy's promise* made *to Marty Popejoy.* It was this promise that induced Marty Popejoy to convey the property to PK & M Associates, Inc. and induced PK & M Associates, Inc. to make the representations of ownership to Kearney Commercial Bank as to ownership of the property on which the Bank relied in entering into the October 1998 loan transaction.

(emphasis added)

■■■ The court also found, however, that at the time of the loan transaction "the Bank had no knowledge of the 'Confidential Title Holding Trust Agreement.'" Thus, the trial court specifically found that the Bank had no knowledge of Donald's promise when it agreed to the loan and the taking the property to secure the loan. If there was no knowledge of the promise at the time the action was taken, then logically there can be no reliance on that promise. *See Bulman v. Safeway, Inc.,* 144 Wash.2d 335, 27 P.3d 1172, 1175 (Wash. Banc 2001) (employee was ignorant of promise in employee handbook, so reliance element of promissory estoppel was missing); *Cordemex, S.A. De C.V. v. Dayton Imps. Corp.,* No. CA 9826 1987 WL 6245, at *4 (Ohio Ct.App. Feb 4, 1987) (holding that third party that did not know of promisor's promise to promisee could not piggyback on promisee's detrimental reliance.) In this case, as the court found, Bank relied on the *representation of ownership* made by Marty, not the promise. Whether Marty actually relied on the

promise of Donald in making the representation, to allow Bank to "boot-strap" its reliance on Marty's representations to Marty's reliance on the promise would be to extend the doctrine of promissory estoppel beyond that which is contemplated by the Restatement or case law.

As noted above, Bank did not enter into the loan transaction based upon Donald's promise, but upon Marty's representation of ownership. It believed, based upon Marty's assertions and the title company's erroneous report, that PK & M owned the Property. While this does not support reliance to invoke the doctrine of promissory estoppel, this court could foresee a similar situation that would result in application of the doctrine. For example, had Donald stated that he would transfer the property to Marty in order for Marty to pledge the property as security, then Bank, relying on Donald's promise to transfer, loaned money to Marty, this court's decision might be different. *See* Illustration 5 to Restatement (Second) Contracts § 90. That is not the case here.

While this court agrees with Bank's assertion that a third party can seek to enforce a promise under § 90, it has provided, and this court has found, no case law or other basis on which this court could enforce the promise under these facts. This court's decision is contemplated, however, in the concurring opinion in *C.R. Fedrick, Inc. v. Sterling–Salem Corp.,* 507 F.2d 319, 323 (9th Cir.1974) (Merrill, J., concurring):

In limiting the beneficiaries who may enforce a promise, California courts in my view would require that the promisor intend his offer to reach the third party without undergoing change en route; *that it must be the offer of the promisor and not some intervening elaboration or modification on which*

*the third party relies.* If the promise has, with the promisor's knowledge, prompted the promisee to make his own more comprehensive or simply different promise to the third party, third party could not claim to be entitled to enforce the promisor's offer.

(emphasis added). Here, the promise or representation of Marty made to Bank was not the original promise, i.e., to transfer the property to Marty, but a representation of his actual ownership to the Bank, which representation was later shown to be incorrect. Thus, there was no reliance by the Bank, the party seeking to invoke the doctrine of promissory estoppel, based on a promise made by Donald.

Furthermore, the evidence at trial indicates that the actions taken by Bank were not based solely on the representations of Marty. David Hinck, the Executive Vice-President and Chief Lending Officer, testified at trial that decisions concerning the ownership of property are not based solely upon representations by Marty on behalf of PK & M, the borrower, but was confirmed through a title search from a title company. Here, there was an intervening factor that also induced Bank to enter into the transaction with Marty and PK & M— the title report indicating that PK & M was the sole owner of the property. Equity would not be served by allowing a party to enforce a promise where that party's actions were influenced by factors other than the promise. *See e.g., Simpson Consulting v. Barclays Bank,* 227 Ga.App. 648, 490 S.E.2d 184, 193 (1997) (noting that since promissory estoppel is an equitable doctrine, reliance must be reasonable, which means that the plaintiff relied exclusively on such promise and not on his or her own preconceived intent or knowledge). Had the title search been properly conducted, recognizing a problem with the chain in title, Marty's representations would likely have been questioned by Bank and the matter of title to the property cleared prior to completion of the loan transaction.

## FORESEEABILITY

It would appear the Bank has potential meritorious claims against Marty and PK & M (mentioned in footnote 3), as well as a remedy against the title company on its policy in favor of the Bank. *Hanson v. Neal,* 215 Mo. 256, 114 S.W. 1073, 1082 (Mo. banc 1908). Although this court does not approve or condone the actions of the Popejoys in obtaining the loan, this set of facts is not one where promissory estoppel should be enforced.[4]

The portions of the judgment of the trial court based on enforcement of promissory estoppel are reversed, and the cause is remanded.

All concur.

### APPENDIX

| DATE | DESCRIPTION |
| --- | --- |
| 3/90 | Brothers' Marty and Donald Popejoy, Jr. (not married) purchased property and take title as joint tenants. Were going to develop with their Dad and Launius. |
| | Copper Electric (composed of Father, Marty & Donald) incur debts and get loans from Bank. |

4. The agreement to convey the property to Marty without consideration in order to avoid payment of federal income taxes was possibly an agreement to enter into a fraudulent conveyance. *See United States v. Engh,* 330 F.3d 954, 956 (7th Cir.2003) (holding that transfer of realty to family members without consideration in order to avoid paying federal income taxes was a fraudulent conveyance).

| | |
|---|---|
| 1993 | Donald marries Lana, they operate Commercial Electric. |
| 4/95 | Marty and Kimberly, Donald Jr. and Lana execute DOT on property to Bank for loan of $60,000 to Marty and wife. |
| 1/96 | Donald Jr., Donald Sr., Marty and Launius meet in lawyer Cook's office to transfer Donald Jr.'s interest in property to Marty to: (1) avoid levy of IRS v. Donald Jr.; (2) avoid creditors of Donald Jr. and Copper Electric; and (3) to develop property Donald Jr. tells other he and wife will sign confidential agreement. At that meeting, Donald Jr. quit claims interest to Marty, and promises he will take quit claim deed home for Lana to sign, and he will then record. Donald Jr. and Marty sign agreement and Donald Jr. takes it home for wife, Lana, to sign—she does. Bank's petition alleges Donald Jr. told Bank and others he has recorded deed with his and Lana's signatures. Agreement provides Donald Jr. and wife will transfer property to Marty. |
| 3/14/96 | Marty incorporates PK & M to take title of land. |
| 3/18/96 | Marty, thinking Donald Jr. has recorded quit claim deed (Donald Jr. and wife to Marty) executes warranty deed of the property to PK & M. Bank's Petition alleges Donald Jr. knew of this plan. |
| 4/96 | Commercial Electric (Donald Jr. and Lana's business) closes—they owe IRS $86M in taxes. |
| 9/96 | Bank loans $100,000 to Copper Electric. Marty, believing Donald Jr. has recorded deed, arranges for PK & M to execute DOT on property as security. |
| 7/97 | Copper Electric owes Bank $184,000. PK & M guarantees, secured by PK & M's DOT. Bank releases DOT of 9/96. |
| 10/98 | PK & M and Bank loan transaction. PK & M purchases 4 notes from Bank, makes of which are Copper Electric (3 totaling $186M) and Marty and wife (1 note, balance $17M) The Copper Electric notes represent funds it borrowed to pay for Donald Jr.'s debts. The Marty and wife note was secured by property. In return, PK & M makes note to Bank $308,223 and gives 1st DOT to Bank warranting it has power to convey property. Bank, Marty and PK & M agree July 1997 DOT subordinated to this DOT. (Marty and PK & M both sign affidavits PK & M owns property and no other agreements outstanding which would affect title.) |
| 9/98 | Missouri Division of Employment secured files lien against Donald and Lana. |
| 8/99 | Donald Jr.'s attorney writes to Bank saying he is "co-owner" of property with PK & M and Marty attempted to convey property without Donald Jr. or Lana's knowledge. Enclosed was a copy of 1/96 Trust Agreement which bore file stamp date of 7/99, when Donald Jr. recorded the Agreement. |
| | No payments on loan since 10/99, and with interest, amount in default of $397,200. |
| 11/99 | Marty tells Bank no more payments since Donald Jr. had "filed a claim." |
| | After a spirited trial court found Bank did not know of trust Agreement. Court finds the Bank relied on the promise from Donald Jr. to Marty to convey by quit claim deed, and it was this promise that induced Marty to convey property to PK & M and to make its representations as to its ownership of property. The court's judgment stated: (1) Donald Jr.'s wife, Lana had no title in the property since Donald Jr. and Marty acquired property prior to Lana and Donald Jr.'s marriage; (2) neither Donald Jr. and Lana, nor Marty and Kimberly, had any interest in property, and that PK & M held fee simple title since March 1996; and (3) the PK & M DOT in favor of Bank was enforceable as a first deed of trust. Appeal by Donald, Jr. and Lana. |

Title Company's search for Bank showed March 1996 Warranty Deed from Marty to PK & M and reported title vested in PK & M.