# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1800

_____

| | | |
|---|---|---|
| City of St. Joseph, Missouri, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Southwestern Bell Telephone, | * | |
| formerly known as Southwestern | * | |
| Bell Telephone Company, L.P., | * | |
| | * | |
| Appellee, | * | |
| | * | |
| Olsson Associates, Inc., | * | |
| | * | |
| Defendant. | * | |

_____

Submitted: November 18, 2005
Filed: February 24, 2006

_____

Before SMITH, HEANEY, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

This case stems from a road-widening and reconstruction project on Faraon Street in St. Joseph, Missouri ("the Faraon Project"). The City of St. Joseph ("the City") sued Southwestern Bell Telephone, L.P. ("SWBT"), claiming that the City incurred additional contractor costs because SWBT failed to move its underground

telephone lines for the Faraon Project. SWBT moved for summary judgment on all claims and asked the district court[1] to strike the affidavit of Roger Sparks, the Engineer of Streets and Sewers for the City. The district court granted summary judgment to SWBT and struck Sparks's affidavit, concluding that it was a "sham" affidavit. The City appeals, arguing that the district court erred in striking Sparks's affidavit; determining that the City failed to establish a claim for promissory estoppel against SWBT; and determining that the City failed to establish a claim for negligent misrepresentation against SWBT. We affirm.

## I. *Background*

In 1999, the City announced its plans to make improvements on Faraon Street. The City hired Olsson Associates ("Olsson") to provide design services and construction-phase services to the City and to act as the City's representative on the Faraon Project. On May 14, 1999, Olsson informed the affected utility companies by letter. In addition, Olsson sent plan sheets to the utilities and requested that they review the locations of their facilities and return the plan sheets to Olsson. SWBT received a copy of the letter and the request to return the plan sheet.

By June 1999, SWBT knew that it would have to move its lines and facilities for the Faraon Project. Sometime between May 1999 and November 1999, SWBT decided to replace the existing lines and install new lines throughout the entire length of the Faraon Project. However, Comco Designs ("Comco"), SWBT's contractor, did no work on designing the placement of the new lines during this time period.

On November 3, 1999, Olsson sent SWBT a letter stating that the Faraon Project would commence in May or June of 2000. On November 30, 1999, the City held a utility coordination meeting to ensure that the parties involved with the Faraon

---

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

Project were not delayed in their work. SWBT employee Bill Hansen, Manager of Engineering Design, attended the meeting. At that time, Hansen thought SWBT's existing line would only minimally interfere with the Faraon Project.

On February 28, 2000, Olsson mailed SWBT a 90% final design plan for the first phase of the Faraon Project. In the accompanying letter, Olsson informed SWBT that the City would begin construction of the Faraon Project in June or July of 2000. SWBT did not object to this schedule.

On April 4, 2000, pursuant to SWBT's work request on January 26, 2000, Comco provided work prints to SWBT for the abandonment of the existing lines and the installation of new lines in connection with the Faraon Project. None of Comco's plans showed a temporary relocation of existing SWBT telephone lines and facilities. To implement Comco's prints, SWBT needed to review the drawings to ensure that they coincided with SWBT's overall plan to relocate its existing telephone lines and facilities; obtain a price from a contractor to implement the drawings; and obtain the approval of Lloyd Baskett, Director of Engineering Construction for SWBT. However, prior to the end of May, no one at SWBT had reviewed the work prints.

In April 2000, Roger Sparks, City Engineer for Streets and Sewers and the Project Manager for the Faraon Project, became concerned that SWBT would impede road construction. The City's April 25 meeting for prospective bidders confirmed Sparks's concerns. At the meeting, Chip Cocoran of Olsson recorded in a section of his notes entitled "utility relocation" that "[t]elephone is the most significant conflict, design of relocation underway, no work yet. Two fibers and 500 pari in Phase 1."

Subsequently, Olsson's Kent Evans inquired of SWBT about the time frame for SWBT moving its cables. Kraig Arthur, Manager of Engineering Design for SWBT, took the call from Evans because he was filling in for Hansen while he was on medical disability leave. During the phone conversation, Evans indicated to Arthur

-3-

that Olsson would like to have SWBT's work finished by the end of June 2000. Arthur said that would "probably be possible." Arthur was aware that the City planned to start construction on the Faraon Project in July 2000. Arthur told Evans that he would discuss SWBT's time frame with John P. Garrett, SWBT's Construction Manager, and get back to him.

When Arthur asked Garrett whether SWBT could have its lines moved by the end of June 2000, Garrett told Arthur that SWBT could have its lines moved by that time. Arthur also reviewed SWBT's prints to install the new telephone lines and facilities. Pursuant to Evans's request, Arthur sent a letter to Evans on May 1, 2000, which stated: "Southwestern Bell Telephone *plans to* have the telephone cables moved to the South by the end of June. We will start work in the next few weeks. If you have any questions, please call (815) 271-2447" (emphasis added). Arthur did not have his letter to Evans reviewed or approved by his supervisors at SWBT before he sent it. Arthur testified that when he sent the letter, he had no reason to believe that SWBT could not move its cables by the end of June.

On May 3, 2000, the City attached Arthur's letter, along with letters from other utilities, to an addendum to its bid documents. The City, however, failed to inform Arthur or anyone else at SWBT that it would provide Arthur's letter to bidders on the Faraon Project. On May 9, 2000, the City selected Loch Sand and Construction Company ("Loch Sand") as the lowest bidder. SWBT never received a copy of the contract between the City and Loch Sand.

At the beginning of May 2000, Sparks did not know what methods SWBT would use to relocate its facilities on Faraon Street. Sparks testified that the City "didn't have a commitment from [SWBT] in any way that they [sic] would be done." Then, on May 25, 2000, three and a half weeks after the City received Arthur's letter, Sparks spoke with Hansen, who had returned from medical leave, about Arthur's letter. When asked what he recalled about his conversation with Hansen, Sparks

-4-

stated that what he recalled was in the e-mail he sent to Cocoran about his conversation with Hansen. In the e-mail, Sparks stated:

> Talked with the telephone company today (SW Bell). The lead engineering guy, Bill Hansen, was surprised to here [sic] that we have a letter from them stating that they would be clear of the construction by July 1. He thought they might be started by then. This leaves us in a slight predicament. I never could figure out how they were going to relocate before the contractor completed the cuts and fills anyway. . . . I have asked Bill to get his people together for a meeting with us and perhaps the contractor to figure out how this can be done . . . .

When questioned about the e-mail during his deposition, Sparks stated that Hansen told him that SWBT would not have its lines and cables moved prior to June 30, 2000, and that SWBT *might* start with the relocation by July 1, 2000, but that SWBT would not be finished by that time. Sparks testified that the "slight predicament" he referred to in his e-mail was Loch Sand wanting to commence work at the same time that SWBT would be relocating; therefore, they would have to "work together or around each other."

Despite Sparks's deposition testimony, the City relies on Sparks's post-deposition affidavit[2]—which Sparks signed the same day that the City's Suggestions

---

[2]Sparks's affidavit is as follows:

On May 25, 2000, I had a conversation with Mr. Hansen. Mr. Hansen informed me that he had returned from medical leave and had not seen the May 1, 2000 letter. Mr. Hansen told me that SWBT would not be complete with the relocation of the telephone lines and facilities for the entire 5,900 feet of the Project, but SWBT would start work before the end of June 2000 so as to not interfere with the Contractor's work. Mr. Hansen told me that there would be certain points in the first 1,400 feet of work for the project where SWBT's relocation work would need to be

in Opposition to the Defendant's Motion for Summary Judgment was due to the court—in which Sparks claims that Hansen told him that SWBT would start work before the end of June and that SWBT was committed to "working ahead of the City's contractor" so that SWBT would not interfere with the contractor's work.

The City's legal troubles arise because Loch Sand encountered delays in the performance of its contract with the City due to SWBT's and other utilities' relocation or replacement of their utility lines. The City issued Loch Sand a Notice to Proceed ("Notice") despite having no firm dates for completion of the utility work. Sparks testified in his deposition that on June 20, 2000, he assumed Loch Sand would have some interference from SWBT of an undetermined extent.

SWBT claims that it could not relocate its cables before the City completed its process of obtaining right-of-ways from adjacent landowners through eminent domain proceedings. Neither party disputes, however, that in the first stage of the Faraon Project, no right-of-way issues existed as of April 4, 2000, that would have prevented SWBT's contractor from replacing SWBT's lines. The City contends that at all times during the Faraon Project, sufficient room existed in the right-of-way for SWBT to install its new telephone lines and facilities. The City asserts that within the first 3,500 feet of the project, SWBT had 20 to 25 feet of existing right-of-way in which to work. According to the City, by June 12, 2000, the City had obtained the right-of-

coordinated with the work of the City's contractor. This type of coordination is normal and usual on a road reconstruction widening project. However, Mr. Hansen never told me that SWBT would work behind the City's contractor. During this conversation, Mr. Hansen told me that SWBT was committed to working ahead of the City's contractor which was the important part of the promise that SWBT made on May 1, 2000, and this was consistent with what SWBT had told the City all along.

way, with the exception of three properties involved in a condemnation proceeding. All of the City's assertions are based on the aforementioned affidavit Sparks executed after his deposition. SWBT responds that no evidence exists that Sparks had either sufficient personal knowledge or experience to support these assertions. Neither party disputes, however, that St. Joseph Light & Power previously advised the City, in writing, that it could not move its poles and lines until after the City obtained the right-of-ways.

In addition, St. Joseph Light & Power told SWBT that it could not dig within ten feet of the power poles to lower SWBT's existing cables because the power poles would collapse, meaning SWBT could not move its power lines for a period of time. The City, relying on Sparks's affidavit, claims that SWBT's contractor refused to relocate any of SWBT's telephone lines and facilities until Loch Sand had completed a substantial portion of the excavation work for the first stage of the Faraon Project. SWBT, however, relies on Sparks's deposition in which he testified that, in early July 2000, SWBT's contractor stopped work because it could not relocate the phone lines because of the power poles.

On September 3, 2003, the City settled claims made by Loch Sand. In the settlement agreement, Loch Sand executed a release in favor of the City. The agreement did not extinguish the liability, if any, of SWBT to Loch Sand. Loch Sand and SWBT never entered into an agreement or contract. The City filed suit against SWBT, arguing that it incurred additional contractor costs because of SWBT's failure to move its underground telephone lines. The City asserted five claims against SWBT, including promissory estoppel and negligent misrepresentation.[3] SWBT subsequently filed a motion for summary judgment on all claims and asked the court

---

[3]The City does not appeal the district court's grant of summary judgment to SWBT on the claims of fraudulent misrepresentation, noncontractual liability, and contribution.

to strike Sparks's affidavit as contradictory to Spark's deposition testimony. The district court granted SWBT summary judgment on all claims and struck Sparks's affidavit, finding that "glaring contradictions" existed between Sparks's deposition testimony and his affidavit.

## II. *Discussion*

The City raises three arguments on appeal: (1) that the district court erred in striking Spark's affidavit from the record; (2) that the district court erred in granting summary judgment to SWBT on the City's claim of promissory estoppel; and (3) that the district court erred in granting summary judgment to SWBT on the City's claim of negligent misrepresentation. We review a district court's grant of summary judgment de novo. *Stuart v. General Motors Corp.*, 217 F.3d 621, 630 (8th Cir. 2000).

## A. *Striking of Sparks's Affidavit*

The City first argues that the district court erred in striking Sparks's affidavit from the record, claiming that Sparks's subsequent affidavit does not directly contradict his previous deposition testimony. The City relied on Sparks's affidavit in response to SWBT's motion for summary judgment. SWBT counters that the district court did not err in striking the affidavit because it amounted to a "sham" affidavit under this court's precedent.

Under Federal Rule of Civil Procedure 56(c), we will sustain an entry of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir. 1983).

In *Camfield*, we addressed "the troublesome issue of whether summary judgment may be granted when one of the parties after giving a deposition later files an affidavit with directly contrary statements." *Id*. In affirming the district court's grant of summary judgment for the defendant, this court held that an affidavit filed by the plaintiff in opposition to a motion for summary judgment that directly contradicted the plaintiff's previous deposition testimony was insufficient to create a genuine issue of material fact under Rule 56. *Id*. at 1365. We stated:

> The very purpose of summary judgment under Rule 56 is to prevent "the assertion of unfounded claims or the interposition of specious denials or sham defenses . . . ." 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2712 (1983). If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Id*. We emphasized that while summary judgment "is to be reserved for those cases in which there is no genuine material issue of fact for determination," if "testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment." *Id*. No party should be allowed to create "issues of credibility" by contradicting his own previous testimony. *Id.* at 1366.

District courts, however, must use extreme care in examining such issues and only grant summary judgment where "the conflicts between the deposition and affidavit raise only sham issues." *Id*. Accordingly, when the affiant states in his affidavit that he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear, the district court should not strike the affidavit from the record. *Id*. at 1364–65. In addition, when the affiant's affidavit does not actually contradict his earlier testimony, the district court should

not strike the affidavit from the record. *Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999).

Here, the district court "articulat[ed] with care its reasons" for finding that Sparks's affidavit contradicted his prior deposition testimony. *Camfield*, 719 F.2d at 1366. First, while Sparks testified in his deposition that Hansen told him that SWBT "might be" started with the relocation by July 1, 2000, he stated in his affidavit that Hansen told him that SWBT would "start work before the end of June 2000 so as to not interfere with the Contractor's work," which was to commence on July 5, 2000. The two statements are inconsistent because Hansen could not say that SWBT *might* start the relocation by July 1, 2000, and simultaneously commit SWBT to definitively starting the relocation before June 30, 2000.

Second, Sparks's claim in his affidavit that Hansen told him that SWBT was "committed to working ahead of the City's contractor" conflicts with his e-mail to Cocoran in which he wrote that he "never could figure out how they were going to relocate before the contractor completed the cuts and fills anyway." In addition, Sparks testified in his deposition that the "slight predicament" the City was in was "a contractor wanting to start about the same time that Bell is going to be there," meaning they would have to "work around each other." Therefore, Sparks's e-mail and deposition testimony reveal Sparks's understanding, as of May 25, 2000, that SWBT would *not* be working ahead of the City's contractor.

Third, Sparks never claimed in his affidavit that he was confused in his deposition or that he needed to clarify statements he made in his deposition.

Finally, we agree with the district court that the City's filing of Sparks's affidavit on the same day that the City's Suggestions in Opposition to Defendant's Motion for Summary Judgment were due is highly suspicious. The timing of the affidavit, combined with the aforementioned factors, indicate that the City engaged

in a last-minute effort to create a genuine issue of material fact to prevent the district court's entry of summary judgment in SWBT's favor. Therefore, we hold that the district court was entitled to "grant summary judgment where [the City's] sudden and unexplained revision of testimony create[d] an issue of fact where none existed before." *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 298 (8th Cir. 1988).

## B. *Promissory Estoppel*

The City's second argument on appeal is that the district court erred in granting summary judgment to SWBT on the City's promissory estoppel claim. Promissory estoppel allows courts to enforce a promise on equitable grounds, even where parties did not enter into a contract. *Prenger v. Baumhoer*, 939 S.W.2d 23, 27 (Mo. App. 1997). The doctrine of promissory estoppel is to be applied "with caution, sparingly and only in extreme cases to avoid unjust results." *Kearney Comm'l Bank v. Popejoy*, 119 S.W.3d 143, 146 (Mo. App. 2003); *see also Shumate v. Dugan*, 934 S.W.2d 589, 594 (Mo. App. 1996) (stating that "estoppels . . . should not be lightly invoked" and should be "applied with care and caution and only when all elements clearly appear"). To prevail on a promissory estoppel claim, a party must establish the following four elements: (1) a promise; (2) promisee detrimentally relies on the promise; (3) promisor could reasonably foresee the precise action the promisee took in reliance; and (4) injustice can only be avoided by the enforcement of the promise. *Kearney*, 119 S.W.3d at 147 (internal quotations and citation omitted). If a party is unable to establish any one of the four elements, his claim fails. *See Prenger*, 939 S.W.2d at 26 (stating that a party must establish the four elements to sustain a claim for promissory estoppel).

Therefore, to maintain a claim for promissory estoppel, a party must first prove that a promise was made. "A promise is a manifestation of intention to act or refrain from acting in a specific way, so made as to justify a promisee in understanding that a commitment has been made." *Kearney*, 119 S.W.3d at 147 (internal quotations and citations omitted). A promise is the promisor's expression of an intention to "bring

-11-

about a specified result in the future." *Id.* (internal quotations and citation omitted). The promise must be definite and made "in a contractual sense." *Id.* (internal quotations and citation omitted). "'A supposed promise that is 'wholly illusory' or a mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance.'" *Prenger*, 939 S.W.2d at 27 n.5 (quoting 3 CORBIN ON CONTRACTS, § 8.9 n.2 (Eric Mills Holmes rev. ed. 1996)). In addition, a promise of future work that is phrased in terms of an "estimate" or "guesstimate" is not sufficiently definite to support a claim of promissory estoppel. *Amecks v. Southwestern Bell Telephone Co.*, 937 S.W.2d 240, 242 (Mo. App. 1996).

In the present case, the City relies on Arthur's letter and Hansen's statements at the November 1999 meeting to establish that SWBT made a "promise" to the City to have the telephone lines and facilities moved so that they would not interfere with the Faraon Project. Arthur's letter, however, only stated that SWBT "plans to have the telephone cables moved to the south by the end of June." "Plan" means "to have in mind; intend." WEBSTER'S DICTIONARY (9th ed.). According to *Prenger*, a mere expression of intention or desire is insufficient to qualify as a promise. Furthermore, Sparks testified in his deposition that the City "didn't have a commitment from [SWBT] in any way that they would be done."

Likewise, Hansen's statement at the November 1999 meeting that SWBT would commence relocation "as soon as possible" with "minimal" interference does not qualify as a promise because Hansen did not set an affirmative date as to when SWBT would start work, nor did he guarantee that no interference would occur with the Faraon Project.

Because the City has failed to prove that SWBT made a "promise" to the City to have the telephone lines and facilities moved so that they would not interfere with the Faraon Project, its claim for promissory estoppel fails.

-12-

C. *Negligent Misrepresentation*

The City's final argument on appeal is that SWBT made a negligent misrepresentation through Arthur's letter, which stated that SWBT planned to finish the relocation work by June 30, 2000. Negligent misrepresentation requires that the defendant has "failed to exercise reasonable care or competence to obtain or communicate true information." *Jim Lynch Cadillac, Inc. v. Nissan Motor Acceptance Corp.*, 896 S.W.2d 704, 707 (Mo. App. 1995). The elements of negligent misrepresentation are:

> (1) the speaker supplied information in the course of his or her business because of some pecuniary interest; (2) due to the speaker's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) the speaker intentionally provided information for the guidance of a limited group of persons in a particular business transaction; (4) the listener justifiably relied on the information; and (5) as a result of the listener's reliance on the statement, the listener suffered a pecuniary loss.

*Clearly Canadian Beverage Corp. v. American Winery, Inc.*, 257 F.3d 880, 893 (8th Cir. 2001) (applying Missouri law). The failure to prove any of these five elements is fatal to a claim of negligent misrepresentation. *Id.*

"[A] negligent misrepresentation claim cannot arise from a statement regarding the speaker's future intent." *Hoag v. McBride & Son Inv. Co.*, 967 S.W.2d 157, 174 (Mo. App. 1988). "'[I]t is impossible to be negligent in failing to ascertain the truth or falsity of one's own future intentions.'" *Id.* (quoting *Jacobs Mfg. Co. v. Sam Brown Co.,* 792 F. Supp. 1520, 1528 (W.D. Mo. 1992)). Therefore, "[e]ven if the speaker is merely uncertain regarding the truth of the statement of future intention, the statement is fraudulent rather than negligent because the speaker is ignorant of the statement's truth." *Id.*

While "'a claim for negligent misrepresentation generally cannot be based on unfulfilled promises or statements as to future events,'" if "the statement is a representation of the speaker's present intention or concerns matters within the speaker's control," a cause of action for negligent misrepresentation exists. *Wellcraft Marine v. Lyell*, 960 S.W.2d 542, 547 (Mo. App. 1998) (quoting 37 C.J.S. Fraud § 59). "Under this rule, there is liability for negligent misrepresentation as to a future event only if the event was under the speaker's control." *Id*.

Here, the City relies on Arthur's letter to demonstrate that SWBT had a present intent to move the lines in such a way so as not to interfere with the City's contractor, asserting that at the time that Arthur made the representations in his letter, SWBT knew of the impossibility of performance; therefore, SWBT's representations in the letter constitute a false statement of present intent. Furthermore, the City claims that SWBT alone had the ability to perform in accord with its representation that SWBT would not interfere with the City's contractors.

The first deficiency in the City's argument however, is that no evidence exists in the record for finding that Arthur failed to exercise reasonable care before making the statement. Arthur testified that he looked at the preliminary project plans and spoke with Garrett before sending the letter. Based on his conversation with Garrett, he reasonably believed that the lines could be moved by the end of June.

Second, the evidence does not support the City's contention that it justifiably relied on the information supplied in Arthur's letter. Before the City signed the contract with Loch Sand, Sparks spoke with Hansen, who advised Sparks that it would be impossible for SWBT to move the lines by the end of June and that SWBT "might be started" with its work by July 1, 2000.

Finally, the City characterizes Arthur's letter as a statement of present intention. Arthur, however, merely indicated that SWBT "plans to" have the work completed

-14-

by the end of June. "Planning" to do an act indicates a future intent to act, which is insufficient to support a claim of negligent misrepresentation. Furthermore, the City's argument that the relocation of the lines was within the SWBT's control is undermined by evidence that SWBT's cables were buried near electrical poles owned and maintained by St. Joseph Light & Power. SWBT could not move its cables until St. Joseph Light & Power moved its poles.

Therefore, the City's claim for negligent misrepresentation fails.

### III. *Conclusion*

Accordingly, we affirm the district court's grant of summary judgment to SWBT on the claims of promissory estoppel and negligent misrepresentation. In addition, we hold that the district court did not err in striking Spark's affidavit from the record.

_____