[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 05, 2003
THOMAS K. KAHN
CLERK

No. 02-10006

D. C. Docket No. 00-02357 CV-AR-S

ROBERT E. WRIGHT,

Plaintiff-Appellant,

versus

AMSOUTH BANCORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(February 5, 2003)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and NANGLE[*],
District Judge.

---

[*] Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri,
sitting by designation.

EDMONDSON, Chief Judge:

Robert Wright brought suit against AmSouth Bancorporation (AmSouth), alleging that he was illegally terminated from his position with the bank due to his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34. Wright also claimed fraud and negligent supervision under Alabama law. The district court granted summary judgment to AmSouth, in part, because the court determined Wright filed his discrimination grievance with the Equal Employment Opportunity Commission (EEOC) beyond the 180-day statutory filing period. We conclude disputes of material fact exist which, when read favorably to the nonmovant, suggest that unequivocal communication of the termination decision by AmSouth was delivered to Wright fewer than 180 days before Wright filed his grievance with the EEOC, and we vacate the judgment in part.

## BACKGROUND

Wright was hired by AmSouth in June 1997 to serve as the Vice President for Accounting Policy and Research. The parties seem to agree that Wright was qualified for the position, having served in various management and accounting

positions for roughly fifteen years. Wright was 54 years old when he was hired by AmSouth.

Wright's immediate supervisor was Harvey Campbell, Senior Vice President and Corporate Accounting Manager for AmSouth. And Campbell's immediate supervisor, in turn, was Robert Windelspecht, Executive Vice President and Controller for AmSouth.

In December 1997, Wright was selected to participate in AmSouth's Management Incentive Plan (MIP) for 1998. Wright would become eligible to receive a bonus, contingent on his performance and that of his work group. This performance would be measured by written goals established at the beginning of 1998. Windelspecht and Campbell set three goals for Wright to accomplish during the 1998 Plan Year.

In August 1998, Wright underwent evaluation according to the Human Resources Profile Process. Wright contends he received a favorable evaluation from Campbell. But, despite repeated requests, Wright was never given a copy of this evaluation which both he and Campbell had signed. During the discovery phase of this case, AmSouth produced an evaluation dated 3 August 1999 -- signed by Campbell and Windelspecht, but not Wright -- that reported Wright's

performance as less than favorable and needing much improvement. Wright disputes the authenticity of this written evaluation.

On 1 February 1999, Campbell informed Wright that he would receive no annual salary increase nor the MIP bonus for 1998. AmSouth contends both of these decisions were based on Wright's poor performance. Wright claims that his performance was never discussed at the 1 February 1999 meeting, but that he was merely told he would receive no bonus or salary increase due to budgetary constraints. According to Wright, he asked Campbell if he was being fired; and Campbell answered, "No, nothing like that."

The next day (2 February 1999), Wright talked with Windelspecht about his earlier discussion with Campbell. Windelspecht indicated that concerns existed about Wright's performance and suggested that Wright explore other employment opportunities. According to Wright, Windelspecht promised Wright an opportunity to "turn things around" and listed a few areas for improvement.

Windelspecht approached Wright on 18 February 1999 and told Wright that Windelspecht would feel bad if two or three months passed and Wright had failed to send résumés to other employers. In his deposition testimony, Wright said that this conversation indicated to him that "they had made up their mind that they were

going to fire me, and there wasn't anything, you know, that could be done about it."

On 15 September 1999, AmSouth circulated a memorandum that announced the return of Margaret Burks, a former employee who would be assuming the position of Vice President - Accounting Policy and Research - Associate. The title given to Burks was the same as Wright's title, adding only the word "Associate." Burks was 29 years old. When the younger, less experienced Burks was hired with nearly the same title as his, Wright suspected he was the target of age discrimination and that his termination was inevitable. "It sort of looked like things were imminent. I was being pushed out, and somebody was taking my title." Notwithstanding AmSouth's hiring of Burks, Wright swore by affidavit that he continued to perform his duties until he was terminated by AmSouth.

On 1 December 1999, Windelspecht advised Wright to meet with the human resources department of AmSouth to set an end date for his employment. According to Wright, this event was the first mention of a definite termination decision; Windelspecht specifically indicated on 26 July 1999 that no end date was set for Wright's employment. Windelspecht testified at his deposition that he allowed the "time frame [to] extend" because he hoped Wright would find employment elsewhere, which would cast the impression among Wright's co-

workers that Wright left AmSouth on his own volition rather than being terminated by AmSouth.

Wright met with the human resources department on 2 December and told them that he suspected age discrimination was involved with the decision to terminate him. Wright's employment with AmSouth was officially terminated in February 2000. Wright filed his charge of age discrimination with the EEOC on 28 March 2000.

After receiving a right to sue letter from the EEOC, Wright filed suit against AmSouth for age discrimination in violation of the ADEA,[1] fraud under Alabama state law for denying Wright his incentive under the MIP, and negligent supervision under Alabama state law for the misconduct of AmSouth's managerial employees.

The district court concluded that Wright should have known that he was going to be fired when Burks was rehired on 15 September 1999. Because Wright filed his discrimination grievance with the EEOC more than 180 days after 15 September 1999, the district court determined that Wright's ADEA claim was untimely and granted summary judgment in favor of AmSouth. The district court

---

[1] The ADEA claim included both a "termination of employment" claim and a "pattern and practice" claim. Without objection, the pattern and practice claim was dismissed and is no issue in this appeal.

also concluded that Wright failed to offer evidence of a required element for the state law claims and granted summary judgment in favor of AmSouth on those claims as well. The district court -- in an earlier order -- denied portions of a motion by Wright to compel discovery. Wright appeals these conclusions by the district court.

## DISCUSSION

We review a district court's grant of summary judgment de novo, viewing all facts and drawing all inferences in favor of the nonmovant. Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001). "Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law." Id.

## I. ADEA Claim

The ADEA prohibits discrimination based on age "against any individual with respect to his compensation, terms, conditions, or privileges of employment." 29 U.S.C. § 623(a)(1). To file a civil lawsuit for age discrimination, the ADEA

7

requires a plaintiff first to file a discrimination complaint with the EEOC "within 180 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(1).

The 180-day filing period begins to run from "[a] final decision to terminate the employee." Cocke v. Merrill Lynch & Co., Inc., 817 F.2d 1559, 1561 (11th Cir. 1987). And a "final decision" to terminate, "rather than actual termination, constitutes the 'alleged unlawful practice' that triggers the filing period. Thus, the 180-day period is counted from the date the employee receives notice of termination." Id. (internal citations omitted)(emphasis added). A "final decision" that remains uncommunicated to the terminated employee has no impact on the statutory filing deadline. Grayson v. K Mart Corp., 79 F.3d 1086, 1100 n.19 (11th Cir. 1996)("[T]he time for filing an EEOC charge begins to run when the employee receives unequivocal notice of the adverse employment decision.")(emphasis added).

The district court determined Wright failed to meet the 180-day filing requirement, reasoning that Wright should have filed his grievance within 180 days of learning about the hiring of Burks, 15 September 1999:

> The event which triggers the start of the 180 day clock is not necessarily notice of termination or the last day worked, but rather when "the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights."

Wright v. AmSouth Bancorp., No. 00-2357, slip op. at 2-3 (N.D. Ala. Nov. 27, 2001)(quoting Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir. 1994))(emphasis added).  The district court held -- as a matter of law -- that Wright had sufficient notice of the facts necessary to file his case on 15 September 1999.

> [W]hen a supervisor tells a subordinate that his job is in peril, encourages the imperiled employee to look for work with other employers, and then hires someone for a position whose six word title differs only by the addition of the word "associate" and whose duties are essentially the same, the employee should know that he is about to be fired.  If he cannot make such a logical deduction, he is wrong in declaring himself qualified for his job.

Id. at 4-5.  The district court then concluded that Wright knew -- or should have known -- when he received the memorandum announcing the rehiring of Burks that "the potential peril that had stalked him since February had materialized."  Id. at 4.  Because Wright filed his complaint with the EEOC on 28 March 2000, the district court found Wright missed the 180 day filing deadline by two weeks and granted summary judgment to AmSouth.[2]

The district court erroneously combined what we have said about the beginning moment of the 180-day period with what we have said about equitably tolling the statutory filing period.  In Sturniolo, the plaintiff of an age

---

[2] If the date on which the cause of action accrued was 15 September 1999, Wright filed two weeks too late.  If the 2 December 1999 date is credited as the date on which a cause of action accrued, Wright properly filed within 180 days.

9

discrimination case had no knowledge he was replaced in his job by a younger person until several months after his discharge. Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir. 1994). Due to this delay, more than 180 days elapsed from the day Sturniolo received notice of his termination until the filing of his EEOC complaint. Id. at 1024. Because Sturniolo had insufficient information to file his complaint, we said the filing requirement should be equitably tolled "until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights." Id. at 1025. This test for equitable tolling of the filing period is a different idea from establishing the starting point of the 180-day filing period, which relies on unequivocal communication of the adverse employment decision. Grayson, 79 F.3d at 1100 n.19.

The key determination, then, is when Wright received unequivocal notice of his termination. AmSouth points us to no moment before December 1999 when AmSouth's termination decision was unequivocally communicated to Wright. AmSouth mainly argues that Wright admitted that he knew in February 1999 that his termination was inevitable.

> He [Windelspecht] told me that, you know, he would feel real bad two
> or three months down the road if I had to send out some resumes.
> What that said to me was they had made up their mind [sic] that they

10

> were going to fire me, and there wasn't anything, you know, that could be done about it.

AmSouth argues that the alleged discriminatory act, therefore, occurred and was (effectively) communicated in February 1999, more than a year before Wright filed his complaint with the EEOC. In the alternative, AmSouth adopts the equitable tolling analysis of the district court to argue that Wright "knew or should have known" sufficient facts in mid-September 1999 -- when Burks was hired to a position with a title very close to his own -- to conclude that he was allegedly being terminated for discriminatory reasons.

In February 1999, Windelspecht suggested to Wright that he begin looking for work elsewhere. Wright claims Windelspecht specifically stated Wright was not being fired at that time and, actually, might be able to correct his deficiencies. AmSouth argues that Wright's admission that "they had made up their mind that they were going to fire me" is evidence of unequivocal communication of the termination decision to Wright. What this statement evidences is Wright's subjective belief that his termination was inevitable. It provides no evidence of either a firm decision to fire Wright or a communication of such a decision. Wright's statement was nothing more than his subjective deduction based on the circumstantial evidence before him. AmSouth's reliance on Wright's speculation

11

demonstrates the principal weakness of their argument: the absence of an unequivocal communication of the termination decision from AmSouth to Wright.

The reemployment of Burks in September 1999 also offers no proof of an unequivocal communication of termination to Wright. When an employee is left simply to infer and deduce his employment status from the surrounding events, no unequivocal communication of an adverse employment decision has occurred. In the context of a Title VII discrimination case, we have said a plaintiff who "may have had reason . . . to suspect that she might be terminated [based on the circumstances known to her] . . . was not enough to start the charge filing period running." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 849 (11th Cir. 2000)(emphasis in original). We have also said a plaintiff must be "told that she is actually being terminated" before the 180-day filing period begins to run, "not that she might be terminated if future contingencies occur." Id. (emphasis in original).

> Beginning the charge-filing period any earlier would make little sense: to require a plaintiff to file a discriminatory termination charge with the EEOC prior to the receipt of notice of termination would be to require a filing prior to the occurrence of the discriminatory conduct, thereby charging the EEOC with responsibility for the arguably advisory task of investigating a hypothetical case of discrimination.

Id. The same is true with Wright's case.

According to Wright, the termination decision was first communicated to him on 1 December 1999. Accepting as true the assertions of Wright (as we must

12

at the summary judgment stage of litigation), a genuine issue of material fact exists about whether Wright filed his charge of discrimination within 180 days of receiving notice of his termination. Because the existence of this dispute precludes summary judgment on the discrimination claim, we vacate the district court's grant of summary judgment on the finding that the EEOC grievance was filed out of time.[3]

II.     State Law Claims

Wright was selected to participate in the MIP for the 1998 Plan Year, which made Wright eligible to receive an incentive award contingent upon his accomplishing certain goals set by his superiors. Three goals were set for Wright for 1998. Wright claims that he completed his goals and that Campbell refused to review his work in that regard. Windelspecht and Campbell represented that Wright had successfully accomplished none of his 1998 MIP goals and, according to Wright, these comments denied him his rightful incentive.

---

[3] AmSouth also argues the discrimination claim was subject to dismissal apart from its untimeliness, because Wright offered no evidence that AmSouth's nondiscriminatory reasons for termination were pretextual for discrimination. While we may affirm a district court's decision on any adequate grounds, Parks v. City of Warner Robins, 43 F.3d 609, 613 (11th Cir. 1995), the district court, here, has determined nothing on this issue. We decline to address this fact-based issue without first providing the district court the opportunity to address the issue.

Wright brought a fraud claim under Alabama Code (1975) § 6-5-100 et. seq., alleging that AmSouth "represented to [Wright] that he would receive bonus payments due to his participation in [AmSouth's] management incentive program. [Wright] performed his obligations pursuant to [AmSouth's] representations but was never awarded remuneration as represented. [These] representations . . . constitute misrepresentations of material facts." (Emphasis added). In other words, the promises made to Wright on the scope of the MIP were the basis of his state-law-fraud claim.

The district court correctly stated the elements of an Alabama fraud claim: "(1) a misrepresentation, (2) of a material existing fact, (3) on which the plaintiff relied, and (4) which proximately caused injury or damage to the plaintiff." Goodyear Tire & Rubber Co. v. Washington, 719 So. 2d 774, 776 (Ala. 1998). In addition, "to support a claim of promissory fraud, the plaintiff must show that at the time of the alleged misrepresentation (that is, the promise), the defendant intended not to do the act or acts promised, but intended to deceive the plaintiff." Id. The district court concluded that Wright presented no evidence to establish this last element of promissory fraud and granted summary judgment to AmSouth on the fraud claim.

14

The MIP agreement between Wright and AmSouth was anticipatory and promissory. Although Wright, on appeal, attempts to characterize the promise to pay the MIP as a then-present commitment, there was no misrepresentation -- at the time of the alleged statements -- of a "material existing fact." See Intercorp, Inc. v. Pennzoil Co., 877 F.2d 1524, 1534 (11th Cir. 1989)(noting the difference between promissory fraud and a simple misrepresentation)(emphasis added). Because this claim was clearly an allegation of promissory fraud, the burden was on Wright to prove that -- when the promise was made -- AmSouth intended to deceive Wright. Goodyear, 719 So. 2d at 776. Wright cannot meet this burden "merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud." Id. The district court's grant of summary judgment on the state-law-fraud claim was proper.[4] Because the district court correctly determined that the negligent-supervision claim was derivative of the fraud claim, the district properly granted summary judgment on that claim as well.[5]

---

[4] Wright introduces a new theory of misrepresentation on appeal -- that Campbell and Windelspecht misrepresented Wright's performance to others in an effort to prevent Wright's participation in the MIP. Wright has overlooked that the misrepresentation must have been directed at him and also must have been one upon which he detrimentally relied. Parker v. Thyssen Mining Constr., Inc., 428 So. 2d 615, 618 (Ala. 1983). In addition to being an argument not raised below, this argument also fails to meet the elements of a claim for fraud.

[5] Wright offers no argument for the negligent-supervision claim independent of the fraud claim arguments, seemingly conceding that the negligent-supervision claim was derivative of the fraud

15

III.    Discovery

Wright sought discovery of a "computer diskette or tape copy of all word processing files created, modified and/or accessed by, or on behalf" of five AmSouth employees over a two and one-half year period.  Wright made no attempt to narrow his request to something more meaningful and relevant during the discovery period despite an appropriate objection from AmSouth.  The district court denied Wright's motion to compel these items as being overly broad and unduly burdensome.  The court also found that Wright failed to make a "reasonable showing of relevance" for these items.

We review the district court's rulings on discovery issues for an abuse of discretion.  Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1570 (11th Cir. 1992).  This Court has written that discovery in Title VII cases is "not without limits. The information sought must be relevant and not overly burdensome to the responding party."  Id.  On appeal, Wright has not tried to identify particular items within the expansive request nor has he provided a theory of relevance that might narrow the scope of his request.  The district court abused no discretion in its ruling on the discovery issue.

claim.

16

We VACATE the district court's grant of summary judgment on the age discrimination claim, AFFIRM the district court's grant of summary judgment on the state law claims and the district court's denial of certain discovery, and REMAND for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.