2013 ND 38

**Lindsey HYSJULIEN, Plaintiff and Appellant**

v.

**HILL TOP HOME OF COMFORT, INC., and Greg Armitage, Defendants and Appellees.**

**No. 20120163.**

Supreme Court of North Dakota.

March 4, 2013.

Daniel E. Phillips (argued), Fargo, N.D., and Scott T. Solem (appeared), Beulah, N.D., for plaintiff and appellant.

Monte L. Rogneby (argued), Brenda L. Blazer (on brief), and Amanda E. Peterson (on brief), Bismarck, N.D., for defendants and appellees.

CROTHERS, Justice.

[¶ 1]   Lindsey Hysjulien appeals from a summary judgment dismissing her claims for employment discrimination and negligent and intentional infliction of emotional distress against Hill Top Home of Comfort, Inc. and Greg Armitage. We con-clude the district court did not err in granting summary judgment on Hysjulien's claim for negligent infliction of emotional distress. However, because genuine issues of material fact exist regarding the running of the statutes of limitations for her state and federal employment discrimination claims and regarding her intentional infliction of emotional distress claim, the court erred in granting summary judgment on these claims. We affirm in part, reverse in part and remand.

I

[¶ 2]   In 2010, Hysjulien sued Hill Top and Armitage, Hill Top's administrator and chief executive officer, asserting employment discrimination claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the North Dakota Human Rights Act, N.D.C.C. § 14–02.4–01 et seq. ("Human Rights Act"). Hysjulien also asserted claims against Hill Top and Armitage for intentional infliction of emotional distress and negligent infliction of emotional distress.

[¶ 3]   Hysjulien alleged she began working as an occupational therapist at Hill Top, a long term care facility in Killdeer, in 1999, was promoted to head of the physical therapy department approximately five years later and continued to work in that position until her employment was terminated on September 30, 2008. She claimed Armitage assaulted her in May 2005, while attending a work conference in Bismarck with other department heads. She claimed that after an evening of drinking with Armitage and co-workers, she had fallen asleep and been left in Armitage's hotel room at his request, that she awoke shortly after everyone else had left the room and found Armitage naked on top of her trying to remove her clothes and that she resisted and left his room. Hysjulien

claims her work environment changed after that 2005 incident.

[¶ 4] Hysjulien claimed that in January 2006, she reviewed wages for her department and discovered a male physical therapist was paid more than she and other female employees in the department. Hysjulien asserts that when she asked Armitage about the disparity, Armitage said he had made a "deal" with the male employee but was "unwilling" to make a deal with her. Hysjulien claims she was treated in a hostile manner and differently than other department heads. She asserts Armitage would not allow her to hire a qualified physical therapist for an opening in her department, effectively keeping her department short of employees. According to Hysjulien, when the department's other occupational therapist resigned effective September 10, 2008, Armitage authorized Hysjulien to advertise for the open position for only one week, with an application deadline of Friday, September 5, 2008.

[¶ 5] She claimed she met with Armitage on September 2, 2008, and he told her the Hill Top board of directors approved his recommendation to eliminate her department and to terminate her position. Hysjulien claims she advised Armitage that she had been receiving calls for the open position and the deadline for applications was September 5, 2008. Hysjulien asserts that at the September 2, 2008 meeting with Armitage, he told her a decision on closing the department would not be made until after the September 5 deadline for applications.

[¶ 6] On Monday, September 8, 2008, Hysjulien again spoke with Armitage regarding the calls she had received about the open position, but Armitage told her the department would be closed. Hysjulien claims she asked Armitage for written notice that her position was terminated and requested the notification be backdated to their meeting on September 2, 2008. Hysjulien asserts she received the written notice of termination, dated September 2, 2008, from Armitage on September 9, 2008.

[¶ 7] Hysjulien alleges Armitage continued to treat her differently and in a hostile manner through her last day of employment on September 30, 2008. She alleges Hill Top had a policy of paying employees additional pay if they were required to work "short-staffed" in their department but she was not compensated for working short-staffed in her final paycheck. She claims when she contacted Armitage about the issue, he told her she would not be paid for working short-staffed.

[¶ 8] Hysjulien claims that, shortly after her termination at Hill Top, she contacted the North Dakota Department of Labor ("Department") and reported the facts regarding the sexual assault and her employment termination. Hysjulien claims the Department referred her to the North Dakota Attorney General's office, which in turn referred her to local law enforcement authorities to file criminal charges against Armitage, but she chose not to pursue criminal charges.

[¶ 9] On July 2, 2009, Hysjulien filed a discrimination charge against Hill Top and Armitage with the Department, which dismissed her claim after concluding the 300–day deadline for making a claim had expired. Hysjulien submitted additional documentation to the Department, and the Department determined it did not have "authority to investigate" the complaint under state law due to the 300–day statute of limitations and transferred the charge to the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Hysjulien a notice of right to sue on March 2, 2010.

[¶ 10] In June 2010, Hysjulien sued Hill Top and Armitage, alleging employment discrimination and intentional and negligent infliction of emotional distress. Hill Top and Armitage jointly answered Hysjulien's complaint, denying liability. Hill Top and Armitage moved for summary judgment, relying on Armitage's affidavit and Hysjulien's July 2009 sworn statements to the Department. Hysjulien responded with her affidavit. The district court granted summary judgment dismissing Hysjulien's claims against both Hill Top and Armitage.

## II

[¶ 11] "Summary judgment under N.D.R.Civ.P. 56 is a procedural device for promptly and expeditiously disposing of an action without a trial if either party is entitled to judgment as a matter of law and no dispute exists as to either the material facts or the reasonable inferences to be drawn from undisputed facts, or resolving the factual disputes will not alter the result." *Koehler v. Cnty. of Grand Forks,* 2003 ND 44, ¶ 7, 658 N.W.2d 741. A summary judgment movant "bears the burden of establishing there is no genuine issue of material fact and, under applicable principles of substantive law, the [movant] is entitled to judgment as a matter of law." *Id.* In considering a summary judgment motion, the court views the evidence in the light most favorable to the party opposing the motion, who is given the benefit of all favorable inferences reasonably drawn from the evidence. *Id.*

[¶ 12] "Summary judgment is appropriate against a party who fails to establish the existence of a factual dispute on an essential element of [a] claim and on which [the party] will bear the burden of proof at trial." *Koehler,* 2003 ND 44, ¶ 9, 658 N.W.2d 741. "When no pertinent evidence on an essential element is presented to the trial court in resistance to a motion for summary judgment, it is presumed no such evidence exists." *Id.*

[¶ 13] "Whether the [district] court has properly granted summary judgment is a question of law which [this Court] review[s] de novo on the entire record." *Wahl v. Country Mut. Ins. Co.,* 2002 ND 42, ¶ 6, 640 N.W.2d 689. For purposes of applying a statute of limitations, determining when a cause of action accrues normally presents a question of fact; however, if the material facts are undisputed, the issue of whether a statute of limitations has run becomes a question of law. *See Johnson v. Hovland,* 2011 ND 64, ¶ 13, 795 N.W.2d 294; *Abel v. Allen,* 2002 ND 147, ¶ 11, 651 N.W.2d 635.

## III

[¶ 14] Hysjulien argues the district court erred in deciding her claims alleging violations of Title VII and the North Dakota Human Rights Act were not timely filed and in granting summary judgment on those claims.

[¶ 15] In the posture of this summary judgment proceeding, the parties do not dispute that administrative complaints under both the Human Rights Act and Title VII must be filed within 300 days after the claimed discriminatory conduct. *See* N.D.C.C. § 14-02.4-19; 42 U.S.C. § 2000e-5(e)(1). On appeal, the parties have treated Hysjulien's initial complaint received by the Department on July 2, 2009, as the earliest date her charges were filed for calculating the 300-day period under the Human Rights Act and Title VII. We therefore analyze the issues raised by Hysjulien within that time frame and date.

### A

[¶ 16] Hysjulien's arguments regarding whether her initial administrative filing

was within the 300–day period are two-fold. First, she contends she filed her administrative complaint within 300 days from when she received notice of termination from Hill Top. Second, she argues any dispute regarding when she received her termination notice is not dispositive because she also asserts a hostile work environment claim.

[¶ 17] In *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court held that whether a claim of an unlawful employment practice under Title VII was timely filed depends on whether the claim raises discrete discriminatory or retaliatory acts or alleges a hostile work environment. The Court in *Morgan* explained:

"First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Each discrete discriminatory act starts a new clock for filing charges alleging that act.* The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

. . . .

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' "

*Id.* at 113–14, 122 S.Ct. 2061 (emphasis added). The Supreme Court, however, distinguished claims based on a hostile work environment:

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts."

. . . .

*"In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'* To assess whether a court may, for the purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, we again look to the statute. It provides that a charge must be filed within 180 or 300 days 'after the alleged unlawful employment practice occurred.' *A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'* The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that *an act contributing to the claim occurs within the filing*

*period,* the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."

*Morgan,* at 115–17, 122 S.Ct. 2061 (emphasis added) (citations omitted). *See also Jenkins v. Mabus,* 646 F.3d 1023, 1026–27 (8th Cir.2011); *Wilkie v. Dep't of Health & Human Servs.,* 638 F.3d 944, 950–51 (8th Cir.2011); *Rowe v. Hussmann Corp.,* 381 F.3d 775, 781 (8th Cir.2004); *Jensen v. Henderson,* 315 F.3d 854, 859 (8th Cir. 2002).

■ [¶ 18] For purposes of filing a Title VII claim, a discrete retaliatory or discriminatory act occurs on the date it happens, but "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Morgan,* 536 U.S. at 110–117, 122 S.Ct. 2061. In this case, counting backward 300 days from the July 2, 2009 initial filing with the Department, Hysjulien's claim may be timely if it asserts any allegedly discrete retaliatory or discriminatory act or at least one act of an actionable hostile work environment practice occurring on or after September 5, 2008.

**B**

[¶ 19] Hysjulien argues the district court erred in granting summary judgment because genuine issues of material fact exist about whether she received notice of her termination from Hill Top on September 2, 2008—303 days before July 2, 2009—or on September 8, 2008—297 days before July 2, 2009. She argues the September 2, 2008 letter from Armitage informed her she would be terminated effective September 30, 2008 is not dispositive because she actually was unequivocally informed of her termination on September 8, 2008.

[¶ 20] Hysjulien contends that, for summary judgment purposes, any inferences regarding whether she filed her claim within the 300–day period must be resolved in her favor based on when she received unambiguous and unequivocal notice of her termination. In support of her argument, Hysjulien relies on *Stewart v. Booker T. Washington Ins.,* 232 F.3d 844, 849 (11th Cir.2000), a Title VII discrimination case, for the proposition the time period does not begin to run until a plaintiff is told she is actually being terminated.

[¶ 21] In *Stewart,* the court held a plaintiff's reason to suspect she might be terminated is not enough to start the period for filing a claim. 232 F.3d at 849. The court explained the "charge filing period does not run until the plaintiff is told that she is actually being terminated, not that she *might* be terminated *if* future contingencies occur." *Id.* (emphasis in original). *See Flannery v. Recording Indus. Ass'n of America,* 354 F.3d 632, 640–41 (7th Cir.2004) (when a termination decision is final and when unequivocal notice is given presents a question of fact and when "notice to the employee is only sufficient if it provides a *'clear intention* to dispense with the employee's services' ") (quoting *Dvorak v. Mostardi Platt Assocs., Inc.,* 289 F.3d 479, 486 (7th Cir.2002); *Wright v. AmSouth Bancorporation,* 320 F.3d 1198, 1203 (11th Cir.2003)) ("When an employee is left simply to infer and deduce his employment status from the surrounding events, no *unequivocal* communication of an adverse employment decision has occurred."); *Duty v. Norton–Alcoa Proppants,* 293 F.3d 481, 489–90 (8th Cir.2002) (jury properly instructed that a person is considered to have been terminated by his employer on the date he receives notice "which would inform a reasonable person in his position that he had been terminated") (quotation omitted); *Dring v. McDonnell Douglas Corp.,* 58 F.3d 1323, 1328 (8th

Cir.1995) (federal discrimination claim limitations period begins on "the date on which the adverse employment action is communicated to the plaintiff"); *see also Delaware State College v. Ricks,* 449 U.S. 250, 261, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (accrual date begins when the notice communicates an employer's official decision); *Burfield v. Brown, Moore & Flint, Inc.,* 51 F.3d 583, 589 (5th Cir.1995) (limitations period begins when claimant receives unequivocal notice of, or when a reasonable person would know of facts underlying claim).

[¶ 22] Hill Top and Armitage argue Hysjulien's wrongful termination claim was properly dismissed based on her initial representations to the Department that she was terminated on September 2, 2008. They contend Hysjulien's subsequent assertions she did not receive "unequivocal notice" of her termination until September 8, 2008, merely were attempts to avoid dismissal by submitting a "sham" affidavit to defeat summary judgment. Hill Top and Armitage assert Hysjulien changed her recitation of the facts to avoid summary judgment and the facts contradict her sworn statements to the Department.

■ [¶ 23] A "sham affidavit" is defined as "[a]n affidavit that contradicts clear testimony given by the same witness, [usually] used in an attempt to create an issue of fact in response to a motion for summary judgment." *Black's Law Dictionary* 67 (9th ed.2009). Courts have held that when a party attempts to create a fact issue by filing an affidavit contradicting earlier testimony to avoid summary judgment, the party raises a "sham issue of fact instead of a genuine one." *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365 (8th Cir.1983) (addressing district court's authority to strike affidavit submitted by party in resistance to motion for summary judgment); *see also City of*

*St. Joseph v. Southwestern Bell Telephone,* 439 F.3d 468, 475–76 (8th Cir.2006) (same). However, as explained in *City of St. Joseph,* a district court must use caution in striking an affidavit:

"District courts, however, must use extreme care in examining such issues and only grant summary judgment where 'the conflicts between the deposition and affidavit raise only sham issues.' Accordingly, when the affiant states in his affidavit that he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear, the district court should not strike the affidavit from the record. In addition, when the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record."

439 F.3d at 476 (quoting *Camfield Tires,* 719 F.2d at 1366). *See also Baker v. Silver Oak Senior Living Mgmt. Co., L.C.,* 581 F.3d 684, 690–91 (8th Cir.2009); *Roberts v. Park Nicollet Health Servs.,* 528 F.3d 1123, 1126–27 (8th Cir.2008).

[¶ 24] Here, in sworn statements filed with the Department in July 2009, Hysjulien stated that "[o]n September 2, 2008, Mr. Armitage informed [her] that [her] position was to be terminated effective September 30, 2008." In both Hysjulien's complaint and amended complaint, she alleged that on September 2, 2008, "Defendant Armitage informed Plaintiff that her position was to be terminated effective September 30, 2008." However, in response to the motion for summary judgment, Hysjulien submitted an affidavit confirming Armitage told her on September 2, 2008, her department would be closed and she would be terminated, but explaining the notice was not "unequivocal," stating in part:

"On September 2, 2008 I had a conversation with Greg Armitage who advised me that the Board of Directors of Hill Top Home of Comfort had decided to close the occupational therapy/physical therapy department because the department was short staffed and no longer profitable. I advised Mr. Armitage that I was still fielding telephone inquiries about the full-time occupational therapist position advertised for and reminded him that the deadline for applying for this position was the end of the week, September 5th and that I had taken three calls that very day inquiring as to the advertised position. *Although I do not remember the conversation exactly, I was left with the clear understanding that if an occupational therapist could be identified to fill the advertised for position by the end of the week that the department would not have to be closed and I would not be terminated.* Following this conversation I took at least two more telephone calls in the next few days from individuals interested in the occupational therapist position but did not receive any applications by the Friday September 5, 2008 advertising deadline. The following Monday, September 8th, I visited with Mr. Armitage and advised him that I had received no applications for the occupational therapist position. Mr. Armitage responded that he would have no choice then [sic] other than to close the department and terminate my position with Hill Top Home of Comfort. Following that discussion, I emailed Mr. Armitage, "Greg, could you give me a written notice dated last Tuesday giving my notice with the effective dates and reason my position is being terminated? You can just put it in my box in an envelope. Lindsey."

(Emphasis added.)

[¶ 25] In her affidavit, Hysjulien asserts that when she indicated in her statement to the Department that she was notified of her termination on September 2, 2008, she did not then understand the significance of the date she was "actually unequivocally told" her position had been terminated, which was September 8, 2008. With her affidavit, Hysjulien also provided a copy of the newspaper advertisement for the full-time occupational therapist position and her September 8, 2008 e-mail to Armitage requesting her "written notice" be dated September 2, 2008. She contends that although she and Armitage discussed on September 2 the Board's decision to eliminate her department, she was not unequivocally informed her position was terminated until September 8, despite having had asked Armitage to backdate the letter confirming their original conversation.

[¶ 26] Under these circumstances, the question of when Hysjulien unequivocally was terminated from her position presents a factual dispute for the factfinder to resolve. Here, the district court in deciding Hysjulien's claims of discrimination were untimely did not provide any analysis as to how the court reached its decision or even what dates were determinative. Viewing Hysjulien's affidavit in context, a reasonable factfinder would not necessarily conclude her assertions of the subsequent discussions with Armitage on September 8 are directly contrary to her earlier statements under oath to the Department. Rather, her affidavit explains the circumstances regarding how she was notified of her termination and leading to the letter dated September 2, 2008.

[¶ 27] We also note Hysjulien's affidavit is not an attempt to contradict prior deposition testimony, but rather to explain her statements under oath to the Department. Further, we note the district court did not strike Hysjulien's affidavit as at-

tempting to create sham issues. Instead, Hill Top and Armitage are essentially asking this Court to disregard her affidavit as contradictory to her statements to the Department. Based on the undisputed evidence of her meeting with Armitage on September 2, 2008, and their purported conversation on September 8, 2008, we conclude Hysjulien has raised a genuine issue of material fact regarding when she unequivocally received notice of her termination from employment with Hill Top.

C

[¶ 28] Hysjulien argues that because she also claims a hostile work environment, there is no single or discrete act or date before her actual date of termination on September 30, 2008 that would start the statute of limitations running.

[¶ 29] In *Opp v. Source One Mgmt., Inc.*, this Court addressed a plaintiff's initial burden in establishing the prima facie elements of a hostile work environment under Title VII and the Human Rights Act, which requires proving five elements:

"(1) the employee belongs to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the sexual harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action."

1999 ND 52, ¶ 14, 591 N.W.2d 101 (citing *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 n. 4 (8th Cir.1998); *Montandon v. Farmland Indus.*, 116 F.3d 355, 358 (8th Cir.1997)). "If the plaintiff's 'evidence is insufficient to establish an essential element of [the] sexual harassment claim, summary judgment in favor of [the defendant is] mandated.'" *Opp*, at ¶ 14 (quotation omitted). We further explained that

under the fourth element, the plaintiff "must prove the conduct complained of is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at ¶ 18 (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

"To be actionable, a plaintiff must show his or her work environment is both objectively and subjectively offensive, essentially one that a reasonable person would find hostile or abusive. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (stating '[a] sexually objectionable environment must be ... one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so'). *Whether the conduct complained of is 'sufficiently severe or pervasive to alter the conditions of employment' is determined by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity;* whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' *Id.* (citing *Harris v. Forklift Syst., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). 'Whether an environment is hostile or abusive cannot be determined by a "mathematically precise test" ... but conduct that is merely offensive is insufficient to implicate Title VII.' *Quick* [*v. Donaldson Co., Inc.*], 90 F.3d [1372, 1378 (8th Cir.1996) ] (citing *Harris*, 510 U.S. at 21–23, 114 S.Ct. 367)."

"The most salient feature of the alleged harassment in this case is its lack of sufficient severity or pervasiveness. The Supreme Court recently reminded us that Title VII is not a general civility

code, and 'ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' will generally not rise to the level of actionable harassment. *Faragher*, 118 S.Ct. at 2284 (citations omitted). The Supreme Court also cautioned 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' *Id.* at 2283 (internal citations omitted). We similarly conclude isolated incidents of simple teasing, offhand comments, gender-related jokes, or vulgar language lack sufficient severity to alter the conditions of a victim's employment and create a hostile work environment under the North Dakota Human Rights Act."

*Opp*, 1999 ND 52, ¶¶ 18–19, 591 N.W.2d 101 (emphasis added).

[¶ 30] As previously discussed, the Supreme Court in *Morgan* explained that "[a] charge alleging a hostile work environment claim ... will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." 536 U.S. at 122, 122 S.Ct. 2061. In deciding whether an act contributing to a hostile work environment occurred within the filing period, a court must consider "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Rowe*, 381 F.3d at 779 (quoting *Morgan*, at 120, 122 S.Ct. 2061). "[A]cts before and after the limitations period [that are] *so similar in nature, frequency, and severity* ... must be considered part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to th[e] action."

*Jenkins*, 646 F.3d at 1027 (quoting *Wilkie*, 638 F.3d at 951) (emphasis in original).

[¶ 31] Hysjulien contends her discrimination charge to the Department alleged sexual conduct and assault, i.e. sexual harassment, different and hostile treatment thereafter, wrongful termination and wage differences all based both on hostile action creating a hostile work environment and sexual discrimination. She asserts the hostile work environment and wage discrimination continued through her last day of employment, which was undisputedly September 30, 2008. She asserts the hostile and different treatment included her last day of employment because Armitage refused to pay her additional compensation for "short-staffed" days as other employees were purportedly paid. Hysjulien asserts every charge filed with the Department was undisputedly within the 300–day deadline of her last day of employment, September 30, 2008.

[¶ 32] Hill Top and Armitage argue that, rather than a hostile work environment, Hysjulien's complaints are composed of alleged "separate and discrete acts" that are time-barred. Hill Top and Armitage argue Hysjulien's sexual harassment claims were properly dismissed as time-barred because the sole incident of sexual harassment was the alleged May 2005 incident, which occurred well beyond the 300–day time limitation. They argue her claim of being denied "short-staffed" pay in September 2008 alleged a new, discrete act of alleged discrimination for which she was required to make a separate complaint of unfair compensation within 300 days. Hill Top and Armitage argue Hysjulien failed to point to any alleged acts or non-acts supporting her hostile work environment claim and the alleged sexual harassment in 2005 is not sufficient to create a pervasively hostile work environment. They argue Hysjulien's allegations are vague, nonspe-

cific and conclusory and do not establish a prima facie showing of a hostile work environment.

[¶ 33] Nonetheless, Hysjulien asserts in her affidavit opposing summary judgment that following the alleged sexual assault by Armitage, her work environment "changed," including that she lacked opportunity to communicate with Armitage as her direct supervisor; that she was treated "differently" when she approached Armitage to obtain items for her department; that she was treated "differently" than other department heads and was not permitted to attend professional development seminars; and that Armitage withheld information related to her department and negatively affected the working relationship within the department. Hysjulien asserts she received annual performance appraisals in person before the alleged assault, she subsequently received no annual performance appraisals and only was given yearly cost of living wage increases. Hysjulien also contends Armitage's refusal to pay her additional amounts for "short-staffed" shifts on September 30, 2008, as an example her hostile and differential treatment.

[¶ 34] Under the fourth element of a prima facie showing of a hostile work environment, which requires proof the harassment affected a term, condition, or privilege of employment, the plaintiff "must prove the conduct complained of is 'sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment.'" *Opp*, 1999 ND 52, ¶ 18, 591 N.W.2d 101 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). "[T]he Supreme Court has repeatedly said, using the disjunctive 'or,' that a claim of discrimination based on the infliction of a hostile working environment exists if the conduct is 'severe or pervasive.'" *Morris v. City of Colorado Springs*,

666 F.3d 654, 665 (10th Cir.2012) (quotations omitted). Generally, "a single, isolated event is typically insufficient to create a hostile work environment," except "in the case of extreme incidents such as rape or sexual assault," *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir.2012), in which case a single or limited number of severe incidents may create a hostile work environment. *See, e.g., Moring v. Arkansas Dep't of Corr.*, 243 F.3d 452, 455–56 (8th Cir.2001); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808–09 (7th Cir. 2000). *See also Ferderer v. North Dakota*, 447 F.Supp.2d 1053, 1073–74 (D.N.D.2006); *Prindle v. TNT Logistics of North America*, 331 F.Supp.2d 739, 750–751 (W.D.Wis. 2004); *Fall v. Indiana Bd. of Trs.*, 12 F.Supp.2d 870, 878–871 (N.D.Ind.1998).

[¶ 35] As the Court of Appeals explained in *Hostetler*:

"Harassment need not be severe and pervasive to impose liability; one or the other will do. There is no 'magic number' of incidents required to establish a hostile environment. *We have repeatedly recognized that even one act of harassment will suffice if it is egregious.*

"The two principal acts at issue in this case were physical, rather than verbal harassment. Physical harassment lies along a continuum just as verbal harassment does. There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum. Even more inti-

mate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation. *But the acts described in these cases lie at the outer boundaries of conduct that can be labeled nonsevere at the summary judgment stage.* When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance. Recall that the types of physical acts we are discussing in this case already place us within the realm of conduct that unquestionably is harassing. The sole question is whether these acts are severe enough, without the added weight of repetition over time or cumulation with other acts of harassment, to stand alone as the basis for a harassment claim. *Holding such acts not to be severe as a matter of law is another way of saying that no reasonable person could think them serious enough to alter the plaintiff's work environment.* That proposition becomes dubious when the conduct at issue involves unwelcome contact with the intimate parts of one's body."

"The physical, intimate, and forcible character of the acts at issue here persuades us that a factfinder could deem Hostetler's work environment hostile. Accepting Hostetler's version of events as true, her co-worker did not simply steal a quick kiss from her lips, but, holding her face in his hands, forced his tongue into her mouth. When Hostetler subsequently used her body to shield herself from an apparent repeat of that intrusion, Payton began to unfasten her bra, threatening to do so completely and stopping only when another employee entered the office. These acts exceed the kind of fumbled and inappropriate attempts to kiss or embrace the plaintiff that we dealt with [in earlier cases]. A factfinder reasonably could interpret the alleged course of conduct as sufficiently invasive, humiliating, and threatening to poison Hostetler's working environment—indeed, overtones of an attempted sexual assault can be seen in the second incident in particular."

*Hostetler,* 218 F.3d at 808–09 (emphasis added) (citations omitted).

▆▆▆▆▆▆ [¶ 36] As discussed, for Title VII purposes, the timely filing of a charge is a statutory prerequisite to filing suit. *See Morgan,* 536 U.S. at 109, 122 S.Ct. 2061; *Brooks v. Midwest Heart Group,* 655 F.3d 796, 800 (8th Cir.2011). A charge claiming hostile work environment must be filed within 300 days of any act that contributed to the hostile work environment. *Morgan,* 536 U.S. at 115, 117, 122 S.Ct. 2061. As the Eighth Circuit Court of Appeals explained in *Jensen v. Henderson:*

"The Court [in *Morgan*] determined that timely filing provisions require only that '[p]rovided that *an act contributing to the claim* occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.' 'The statute does not separate individual acts that are part of the hostile [work] environment claim from the whole for the purposes of timely filing and liability.' "

"In essence, the Court has simplified the law by allowing courts to view allegations of hostile work environment as 'a single unlawful employment practice.' *Only the smallest portion of that 'practice' needs to occur within the limitations period for the claim to be timely.*"

315 F.3d at 859 (citations omitted) (emphasis added); *see also Rowe,* 381 F.3d at 780–81. In her affidavit opposing summary judgment, Hysjulien describes in detail the seriousness and severity of her alleged May 2005 sexual assault. Despite Appellees' assertion that the facts "at best" present a situation where two consenting adults became voluntarily intoxicated and one of them "misread the situation," Armitage's conduct in the alleged assault, as Hill Top's administrator and chief executive officer, may alone have established liability on a hostile work environment theory had Hysjulien timely complained of the assault. Because Hysjulien did not timely complain of the assault, the length of time passing before she filed her administrative charge means the assault cannot form the basis of the hostile work environment liability unless she shows Armitage's later alleged conduct had some relation to the sexual assault. *See Morgan,* 536 U.S. at 118, 122 S.Ct. 2061.

[¶ 37] Hysjulien presents additional information in her affidavit which could establish such a relationship between the alleged 2005 assault, her altered work conditions and Armitage's alleged later conduct treating her differently. She also asserts that, after being informed of her termination, her hostile and differential treatment based on sex persisted through the end of her employment on September 30, 2008 when Armitage refused to pay her additional amounts for her "short-staffed" shifts. We note courts have considered "facially neutral incidents" as part of the totality of circumstances comprising a hostile work environment claim when the "neutral occurrences" were improperly motivated and part of a pattern of harassment. *See, e.g., Watson v. CEVA Logistics U.S., Inc.,* 619 F.3d 936, 942–44 (8th Cir.2010) (same employees were involved in both "overtly racial incidents as well as incidents that were facially neutral," supporting "plaintiffs' claims that these allegedly neutral occurrences were, in fact, racially motivated and part of a pattern of harassment"); *see also Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir.2002) ("Facially neutral incidents" may be considered among the "totality of the circumstances" in any hostile work environment claim, "so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

[¶ 38] Here, Hysjulien's affidavit is largely uncontradicted by Armitage's affidavit. Viewing the evidence in the light most favorable to Hysjulien, we are unable to conclude as a matter of law that no relation between the alleged assault and subsequent incidents exists and that the pre- and post-limitation period incidents are not part of the same actionable hostile work environment claim. To the contrary, a reasonable factfinder could infer Armitage's acts in September 2008 were related to Hysjulien's sex and part of the same "unlawful employment practice," such that at least one incident contributing to the hostile work environment claim occurred within the 300–day time period. *See Brooks,* 655 F.3d at 800 ("A claim may not be dismissed under Rule 12(b)(6) or Rule 56 where questions of material fact exist as to the timeliness of the complainant's efforts to exhaust it."); *see also Jensen,* 315 F.3d at 859. We therefore conclude the district court erred in granting summary judgment on Hysjulien's hostile work environment claim as untimely.

## IV

[¶ 39] Hysjulien argues the district court erred in granting summary judgment on her claims of intentional and neg-

ligent infliction of emotional distress against Hill Top and Armitage.

## A

[¶ 40] In *Muchow v. Lindblad,* 435 N.W.2d 918, 923–25 (N.D.1989), this Court recognized a cause of action for the intentional infliction of emotional distress under Restatement (Second) of Torts § 46 (1965), requiring proof of "(1) extreme and outrageous conduct that is (2) intentional or reckless and that causes (3) severe emotional distress." "The 'extreme and outrageous' threshold is narrowly limited to conduct that exceeds 'all possible bounds of decency' and which would arouse resentment against the actor and lead to an exclamation of " 'outrageous' " by an average member of the community." *Hougum v. Valley Memorial Homes,* 1998 ND 24, ¶ 26, 574 N.W.2d 812. In *G.K.T. v. T.L.T.,* 2011 ND 115, ¶ 17, 798 N.W.2d 872, this Court reiterated that "*Muchow* and its progeny repeatedly emphasize the strenuously high, 'all possible bounds of decency' standard."

[¶ 41] Whether the alleged actions meet the threshold of extreme and outrageous conduct is a question of law to be decided by the court. *Dahlberg v. Lutheran Soc. Servs.,* 2001 ND 73, ¶ 21, 625 N.W.2d 241. Thus, "[t]he court must initially decide whether a defendant's conduct reasonably may be regarded as 'extreme and outrageous.'" *Hougum,* 1998 ND 24, ¶ 26, 574 N.W.2d 812. However, "[i]f reasonable persons could differ, a plaintiff is entitled to have the trier-of-fact decide whether the conduct is sufficiently extreme and outrageous to result in liability." *Dahlberg,* at ¶ 21.

[¶ 42] Hysjulien claims she presented sufficient evidence to preclude summary judgment on her claim for intentional infliction of emotional distress including a near-rape followed by years of hostile treatment and conduct that has been so outrageous in character and so extreme in degree as going beyond all possible bounds of decency. Viewing the evidence in the light most favorable to Hysjulien, Armitage's May 2005 alleged conduct was "extreme and outrageous" such that Hysjulien is entitled to have a trier-of-fact decide whether the conduct is sufficiently extreme and outrageous to result in liability. Although Hill Top and Armitage argue that, even if Hysjulien's allegations are true, no factual basis exists showing Hill Top or Armitage intended to cause her severe emotional distress. Viewing the factual assertions in Hysjulien's affidavit regarding the alleged May 2005 incident in her favor, we conclude she raised genuine issues of material fact regarding whether Armitage's alleged conduct was sufficiently intentional or reckless and caused severe emotional distress so as to preclude summary judgment on her claim for intentional infliction of emotional distress.

[¶ 43] We conclude the district court erred in summarily dismissing Hysjulien's claim for intentional infliction of emotional distress against Hill Top and Armitage and reverse and remand for further proceedings on that claim.

## B

[¶ 44] For a claim of negligent infliction of emotional distress, a "plaintiff claiming negligent infliction of emotional distress must show 'bodily harm.'" *Hougum,* 1998 ND 24, ¶ 29, 574 N.W.2d 812 (quoting *Muchow,* 435 N.W.2d at 921); *see also* Restatement (Second) of Torts § 436A (1965) ("If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for

such emotional disturbance."). "The bodily harm essential to sustain a claim for relief for negligent infliction of emotional distress is defined in Restatement 2d Torts § 15 (1965) as 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Muchow*, at 921. "Bodily harm may be caused not only by impact or trauma, but also by emotional stress." *Id.* We have explained, however, that transitory phenomena do not meet the requisite showing of "bodily harm":

> "The rule stated in this Section [Restatement (Second) Torts § 436A (1965)] applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable *where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm.* On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law."

*Hougum*, 1998 ND 24, ¶ 29, 574 N.W.2d 812 (quoting *Muchow*, at 921; Restatement (Second) Torts § 436A cmt. c (1965)).

[¶ 45] The evidence fails to raise a reasonable inference of the requisite "bodily harm" supporting Hysjulien's claim for negligent infliction of emotional distress. Hysjulien states that, following the alleged assault, she started suffering from anxiety, fear, frequent and severe headaches, she became short-tempered with her family, and her sex life with her husband diminished. However, she identified no evidence showing these alleged symptoms were anything other than transitory phenomena, rather than long, continuing ailments amounting to physical illness. As a matter of law, Hysjulien failed to raise a genuine issue of material fact that she suffered any substantial "bodily harm," and we affirm the summary judgment dismissing Hysjulien's claims for negligent infliction of emotional distress against Hill Top and Armitage.

[¶ 46] The district court did not err in granting summary judgment to Hill Top and Armitage on Hysjulien's claim for negligent infliction of emotional distress, but erred in granting summary judgment on her claim for intentional infliction of emotional distress for the alleged May 2005 incident. We reverse and remand for further proceedings on Hysjulien's claim for intentional infliction of emotional distress.

## V

[¶ 47] The district court judgment is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

[¶ 48] GERALD W. VANDE WALLE, C.J., DONOVAN FOUGHTY, D.J., and MARY MUEHLEN MARING, J., concur.

[¶ 49] The Honorable DONOVAN FOUGHTY, D.J., sitting in place of KAPSNER, J., disqualified.

SANDSTROM, Justice, dissenting.

[¶ 50] I respectfully dissent.

[¶ 51] Hysjulien's later affidavit appears to be the classic sham affidavit.

[¶ 52] Hysjulien unequivocally told the North Dakota Department of Labor that

she had been terminated on September 2, 2008.

[¶ 53] Hysjulien later filed an affidavit contradicting her earlier statement, saying she did not understand the legal significance of her previous statement in that it terminated her right to pursue her claim, and so she was providing a new version of what had happened. This appears to be the essence of a sham affidavit.

[¶ 54] It is important to note, it was not only the date that was contradicted by her second affidavit. She stated in her first affidavit that she believed it would be easy to fill the vacant positions. In her subsequent affidavit she said it was only after the positions were not able to be filled that she was given unequivocal notice of termination.

[¶ 55] She said in her Department of Labor filing that she was told on September 2 she was being terminated and that there "were other options beyond simply terminating my position, but none were offered." But in her later affidavit she said the alternative to termination offered was that the vacant occupational therapist position would be filled by the application deadline.

[¶ 56] In her Department of Labor filing she said:

On September 2, 2008, Mr. Armitage informed me that my position was to be terminated effective September 30, 2008. He claimed the occupational therapy department was no longer profitable, which I do not believe to be true in light of the documentation he provided me showing that the program was indeed profitable. He also claimed that he did not believe the two positions we had open in the department would be able to be filled. As I had taken three phone calls that day regarding the open positions, I do not believe there would have been any difficulty in filling the posi-

tions. He went on to say that with only one therapist, we would not be able to fulfill our contract with Sakakawea Medical Center as such he would terminate that contract. There were other options beyond simply terminating my position, but none were offered.

(Emphasis added.) In her affidavit in opposition to summary judgment she said:

On September 2, 2008 I had a conversation with Greg Armitage who advised me that the Board of Directors of Hill Top Home of Comfort had decided to close the occupational therapy/physical therapy department because the department was short staffed and no longer profitable. I advised Mr. Armitage that I was still fielding telephone inquiries about the full-time occupational therapist position advertised for and reminded him that the deadline for applying for this position was the end of the week, September 5th and that I had taken three calls that very day inquiring as to the advertised position. Although I do not remember the conversation exactly, I was left with the clear understanding that if an occupational therapist could be identified to fill the advertised for position by the end of the week that the department would not have to be closed and I would not be terminated. Following this conversation I took at least two more telephone calls in the next few days from individuals interested in the occupational therapist position but did not receive any applications by the Friday September 5, 2008 advertising deadline. The following Monday, September 8th, I visited with Mr. Armitage and advised him that I had received no applications for the occupational therapist position. Mr. Armitage responded that he would have no choice then other than to close the department and terminate my position with Hill Top Home of Com-

*fort.* Following that discussion, I emailed Mr. Armitage, "Greg, could you give me a written notice dated last Tuesday giving my notice with the effective dates and reason my position is being terminated? You can just put it in my box in an envelope. Lindsey." (See, Exhibit 2, Email to Greg Armitage from myself dated 9/08/08, attached).

(Emphasis added.)

[¶ 57] The majority, at ¶ 23, notes a district court must use caution in disregarding an affidavit:

> [W]hen the affiant states in his affidavit that he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear, the district court should not strike the affidavit from the record. In addition, when the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record.

*City of St. Joseph v. Southwestern Bell Telephone,* 439 F.3d 468, 476 (8th Cir.2006) (internal quotations and citations omitted). But Hysjulien's later affidavit triggers none of those listed exceptions. Her later statement, justified only by her "not understanding at the time the significance of the date," is not to explain portions of testimony that were unclear or to acknowledge her confusion at her deposition, and it is very much contradictory to her earlier testimony. Hysjulien's later affidavit creates a sham issue of fact.

[¶ 58] Finally, nothing in our rules requires formal striking of sham affidavits before deciding there is no genuine issue as to a material fact. *See* N.D.R.Civ.P. 56.

[¶ 59] I would affirm the district court's grant of summary judgment.